# Janet Carmichael and Carmichael's Homgas Plumbing & Heating, Inc. v. Adirondack Bottled Gas Corporation of Vermont

[635 A.2d 1211]

No. 92-496

Present: Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.

Opinion Filed December 10, 1993

*Richard E. Davis* of *Richard E. Davis Associates* and *Joseph P. Palmisano* of *Joseph C. Palmisano Associates*, Barre, for Plaintiffs-Appellees.

*J. Scott Cameron* and *Bernard D. Lambek* of *Paterson & Walke, P.C.*, Montpelier, for Defendant-Appellant.

**Morse, J.** A jury awarded plaintiffs* Carmichael $160,000 against defendant Adirondack Bottled Gas for breaching an implied covenant of good faith and fair dealing in the termination of their business relationship. On appeal, Adirondack claims that (1) Janet Carmichael was precluded from bringing this action because her claims were resolved either in arbitration or in a federal antitrust case, both of those proceedings having become final; (2) the trial court should have directed a verdict in Adirondack's favor; (3) the court erroneously instructed the jury on the law of breach of good faith; (4) the plaintiffs waived

---

* A question was raised below whether Janet Carmichael was the real party in interest. This action arose from events related to a contract between Adirondack and Carmichael Homgas Plumbing & Heating, Inc. At the time of these events, Janet Carmichael was not a party to the contract with Adirondack, but she was the sole shareholder of Carmichael Homgas. No issue was raised on appeal concerning the identity of the real parties in interest, and we do not address the issue. For the sake of clarity, we will refer to the joint plaintiffs as Janet Carmichael.

their claim for punitive damages and the facts did not warrant punitive damages to be considered by the jury; (5) the court erred in refusing to instruct the jury on the defense of accord and satisfaction; and (6) the award and calculation of interest in the judgment order were erroneous. We affirm.

The evidence supports the jury's concluding that the parties began and ended their business relationship in the following manner: In September 1981, Philip and Janet Carmichael bought an existing petroleum gas distributorship from Allen and Sharon Granger. The transaction required Philip Carmichael to enter into a contractor's agreement with Adirondack. In general, the agreement described the terms under which Adirondack would supply the Carmichaels with the product which they, in turn, would retail to their customers. Furthermore, the agreement contained a "key man" clause, which provided in part:

> *This Agreement shall automatically terminate without written notice upon* the sale or assignment of Contractor's business, *the death of Philip Carmichael* or upon any change in the capital structure, management or ownership of contractor.

(Emphasis added.)

After experiencing ups and downs, the Carmichaels' business turned modestly profitable, but in the summer of 1987, the couple had grown "sick of the gas business" and explored with Adirondack the possibility of selling their distributorship for $60,000. Adirondack was interested in acquiring the Carmichael business in order to convert it from a distributorship to a retail outlet. Adirondack offered the Carmichaels $38,500. The Carmichaels declined the offer.

Six months later, on December 24, 1987, Philip Carmichael died in a snowmobile accident, triggering the "key man" termination provision of the 1981 contractor's agreement. A few days later, David Johnson, Adirondack's district manager, attended Philip Carmichael's funeral. As he paid his respects, Johnson asked Janet Carmichael about her intentions toward the business. Carmichael indicated an intention to stay in business, and Johnson replied that they would get together at a future time to discuss how she would operate the distributorship. Shortly thereafter, Johnson reported the gist of this conversation to his

supervisor, James Harrison. Harrison testified he would not have been opposed to Janet Carmichael continuing in the business, provided she sign a contract in her own right with Adirondack, but Harrison did not communicate that to her. Instead, on January 5, 1988, Adirondack sent a letter to Carmichael's attorney, again offering to purchase the business for $38,500. The letter gave no acceptance deadline, but Carmichael promptly instructed her attorney to inform Adirondack that she still wished to stay in business.

On January 13, 1988, Adirondack corresponded with Janet Carmichael's attorney, instructing him to tell her that the offer would be withdrawn in five days. Two days later, on Friday, January 15, Adirondack's attorney asked Carmichael if she was going to accept Adirondack's offer. She replied, "I'm not going to sell. I'm not going out of business. I want to keep this business." According to Carmichael, the attorney became "very upset with me and he told me at the end of the conversation that no matter what, whether I sold the assets to them or not, I was out of business Monday at noon." Concluding that Adirondack would no longer supply her with fuel as of Monday, Carmichael laid off her employees Friday afternoon. During the weekend, Carmichael sold much of her business equipment for $35,000 to Blue Flame Gas, a local competitor. She did not want to sell to Adirondack because "they wanted to take my business away from me that we had worked hard for."

On Monday, January 18, she returned to her work place and began closing up shop. The phone rang repeatedly that morning with calls from customers needing fuel deliveries. The calls were attended to either on site or by relaying the calls to Adirondack's business phone in Bolton, Vermont. Later that morning, David Johnson stopped by to see Carmichael, who told him she had sold her trucks and discharged her employees. She then handed him a list of customers who required immediate attention from Adirondack.

Shortly after Johnson's departure, Carmichael had another telephone conversation with Adirondack's attorney. According to Carmichael, the attorney again became upset, this time because "I wasn't going to deliver that day. That I had taken him on his word that I was done at noon." The attorney began yelling so loudly that Carmichael held the receiver up so that others who were in the office with her could hear it.

After that phone call, Adirondack arranged a meeting for the next day, January 19, to transfer vital business records and to tie up loose ends as provided for under the distributorship agreement. Fifteen minutes before the meeting, Carmichael was notified that her attorney could not be present. She elected to attend, but announced upon her arrival that she would not discuss legal questions without her lawyer present. Despite this statement, Adirondack repeatedly asked Carmichael to accept and sign a written agreement that had been drafted and signed by Adirondack prior to the meeting. The agreement provided for the transfer of Carmichael's remaining business assets. Carmichael repeatedly refused to sign the document then and there, although she did sign it after the meeting. Adirondack also asked at the meeting to review all of her records, including her customer list, route cards, accounts receivable and other records. Concerned that her customers not be left without fuel in the dead of winter, Carmichael handed over the requested documents. Adirondack then immediately began servicing the customers formerly serviced by the Carmichaels.

The winding down of remaining business affairs between Carmichael and Adirondack was not smooth. Carmichael had claims against Adirondack for the return of deposits, payments under the January 19 agreement, collection of accounts receivable, and other items. Adirondack had claims against Carmichael for inventory that was not returned or otherwise accounted for, fuel that had been supplied but not paid for, and other items. In March 1989, all of these issues were submitted to arbitration by order of the Washington Superior Court, where Carmichael had filed suit against Adirondack. The court ordered that "[c]laims raised by Plaintiff in Civil Action Docket Number S-12-89 WnC which do not arise out of the Contractor Agreement are not subject to arbitration and are properly within the jurisdiction of the Washington Superior Court."

On September 24, 1990, the parties stipulated to the entry of an arbitration award. The award set the various claims of the parties off one against another and concluded that "the adoption of the 'account resolution' set forth herein and the monetary award to Carmichael in the amount of $4,922.26 fully resolves all of the disputes which either of the parties has raised, or could have raised, arising under the Contractor Agreement, as amended, between the parties."

The arbitration proceedings, however, did not address any claim regarding bad faith and unfair dealing. It dealt only with accounting disputes. While the parties were in arbitration, Carmichael initiated suit against Adirondack in federal district court on January 5, 1990, alleging *federal antitrust violations* by Adirondack. Eight months later, Carmichael was granted a stay of the state court proceedings pending the outcome of her federal antitrust suit. Adirondack neither opposed the stay nor attempted to remove Carmichael's state claims to the federal forum.

In December 1991, the district court dismissed Carmichael's antitrust suit with prejudice. Arguing that Carmichael's remaining complaints were now barred by the res judicata effect of the federal court's dismissal, Adirondack moved for summary judgment in state court. In April of 1992, the state court denied summary judgment and the parties proceeded to trial.

After a seven-day jury trial, the trial court directed a verdict in Adirondack's favor on all but one count of Janet Carmichael's complaint. That count, alleging that Adirondack's conduct toward Carmichael following Philip's death amounted to a breach of the implied covenant of good faith and fair dealing, was submitted to the jury, which returned a verdict against Adirondack in the amount of $60,000 compensatory and $100,000 punitive damages. Thereafter, Adirondack filed several post-verdict motions, all of which were denied.

## I.

Relying on the doctrines of res judicata and collateral estoppel, Adirondack first contends that the arbitration award resolving the parties' contractual disputes and the dismissal of Janet Carmichael's federal antitrust complaint precluded her state court action.

## A.

With respect to the legal effect of the arbitration award, we note that the superior court record begins with Carmichael's complaint dated January 9, 1989. Adirondack, however, began seeking arbitration in December of 1988 and filed a motion to compel arbitration before January 9, 1989. The record that Adirondack submitted for our review contains no documents per-

taining to these early proceedings. The trial court decided Adirondack's motion to compel arbitration in March of 1989, but no transcript of the hearing was submitted for our review. The court's order states specifically that it retained jurisdiction over claims Carmichael raised in state court "which do not arise out of the Contractor Agreement." Adirondack argues that the court had intended for the arbitration proceedings to resolve *all* of the parties' claims against each other arising out of their business relationship. This argument, however, is inconsistent with the language in the court's order compelling arbitration. There are no documents in the record that support Adirondack's characterization of the court's intentions or that delineate the scope of the arbitration proceedings. Nor does the record demonstrate that Adirondack objected to the court's retention of jurisdiction or its scope. Consequently, Adirondack has not preserved the issue, and there is no basis on which to give res judicata effect to the arbitration award.

## B.

■ Adirondack contends that the federal court dismissal constituted a final judgment precluding Carmichael's state action. We disagree that the federal court dismissal triggered preclusion of the state court action because defendant's litigation strategy throughout belies any reliance on the doctrines of res judicata and collateral estoppel.

■ Adirondack did not ask to remove and consolidate Carmichael's state claims in the federal forum. See 28 U.S.C. § 1441(a) (state court civil action to federal district court having jurisdiction); 28 U.S.C. § 1367(a) (supplemental jurisdiction exists over claims related to those within the district court's original jurisdiction). At no time before the federal court dismissal did Adirondack object to the maintenance of the two actions or claim that dismissal of the federal action would preclude the state action. In support of its preclusion claim, Adirondack stated that "we take the position that we did not have to move . . . . [I]f they chose to go forward with the federal court action first, that was their prerogative, but they did so at the risk that the decision in that case might preclude litigation of these issues in state court." Similarly, Adirondack claims it was its pre-

rogative not to oppose the stay in state court or to seek removal of the state claims to federal court. Adirondack's position, however, ignores the well-established procedural rule requiring preservation of the issue:

> Where the plaintiff is simultaneously maintaining separate actions based upon parts of the same claim, and in neither action does the defendant make the objection that another action is pending based on the same claim, judgment in one of the actions does not preclude the plaintiff from proceeding and obtaining judgment in the other action. The failure of the defendant to object to the splitting of the plaintiff's claim is effective as an *acquiescence* in the splitting of the claim.

Restatement (Second) of Judgments § 26 comment a (1982) (emphasis added). Adirondack argues that the record below is devoid of any evidence that Adirondack expressly acquiesced to Carmichael's claim-splitting. "Acquiescence," however, denotes an absence of action, a failure to register objection. See The Random House Dictionary of the English Language (2d ed. 1987) (to acquiesce is to assent tacitly, to submit or comply silently or without protest).

■ Adirondack cites no case holding that, *but for* the evidence of defendant's *express* consent, the courts would have precluded a plaintiff from claim-splitting. We hold that evidence of express consent is not the sine qua non for finding acquiescence to claim-splitting. Adirondack's failure to object to Carmichael's strategy is a waiver of the defense of res judicata. Notwithstanding the public policy favoring conservation of judicial resources by allowing a claimant only "one bite of the apple," *Sure-Snap Corp. v. State St. Bank & Trust Co.*, 948 F.2d 869, 870 (2d Cir. 1991), litigation is not a game where surreptitious maneuvering is favored by the rules. See V.R.C.P. 1 (civil rules "construed to secure the just, speedy, and inexpensive determination of every action").

## II.

■ We treat together Adirondack's claims that the jury instruction on Carmichael's claim was erroneous and that, in any event, it was entitled to a directed verdict. Adirondack argues

that it could not have violated "good faith and fair dealing" because no contract existed between the parties as of Philip Carmichael's death. We disagree that the duty of good faith and fair dealing expired abruptly on December 24, 1987, when Philip died. The very nature of their business relationship contemplated that, after the contract termination, the parties owed each other duties with respect to winding down their affairs as long as the post-termination conduct was related to the contractual relationship. See *deTreville v. Outboard Marine Corp.*, 439 F.2d 1099, 1100 (4th Cir. 1971) ("[R]egardless of broad unilateral termination powers, the party who terminates a contract commits an actionable wrong if the manner of termination is contrary to equity and good conscience.").

The definition of the "covenant of good faith and fair dealing" is broad. An underlying principle implied in every contract is that each party promises not to do anything to undermine or destroy the other's rights to receive the benefits of the agreement. *Shaw v. E. I. DuPont de Nemours & Co.*, 126 Vt. 206, 209, 226 A.2d 903, 906 (1966). The implied covenant of good faith and fair dealing exists to ensure that parties to a contract act with "faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." Restatement (Second) of Contracts § 205 comment a (1981). The factual question in this case was whether Adirondack so acted toward Janet Carmichael after her husband died.

Other than stating the underlying principles, little can be said in general as to what constitutes a breach of the covenant. Although we have stated that a covenant of good faith is implied in every contract, an action for its breach is really no different from a tort action, because the duty of good faith is imposed by law and is not a contractual term that the parties are free to bargain in or out as they see fit. Cf. *Ainsworth v. Franklin County Cheese Corp.*, 156 Vt. 325, 331–32, 592 A.2d 871, 874–75 (1991).

We note that "good faith" is a concept that "varies . . . with the context" in which it is deemed an implied obligation. Restatement (Second) of Contracts § 205 comment a (1981). Contextual and fact-specific, the implied good-faith covenant has been the subject of many decisions that have informed the substance of this cause of action. The implied promise by its nature

protects against "a variety of types of conduct characterized as involving 'bad faith' because they violate community standards of decency, fairness or reasonableness." *Id.* As the Restatement points out,

> [a] complete catalogue of types of bad faith is impossible, but the following types are among those which have been recognized in judicial decisions: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

*Id.* § 205 comment d. Further, bad faith inheres in "harassing demands for assurances of performance, rejection of performance for unstated reasons, willful failure to mitigate damages, and abuse of a power to determine compliance or to terminate the contract." *Id.* § 205 comment e. Additionally, "[s]ubterfuges and evasions violate the obligation of good faith in performance even though the actor believes his conduct to be justified." *Id.* § 205 comment d. Finally, the covenant of good faith "also extends to dealing which is candid but unfair, such as taking advantage of the necessitous circumstances of the other party." *Id.* § 205 comment e.

In the end, good faith is ordinarily a question of fact, one particularly well-suited for juries to decide. J. Calamari & J. Perillo, Contracts § 11—38 (c) (1987). It follows that a jury instruction on point will feature few precise analytical elements. Rather, such an instruction will ask the jurors to judge the context within which the alleged offensive conduct occurred.

Adirondack argues that the jury was improperly instructed when the trial court explained the implied covenant of good faith and fair dealing as follows:

> While the contracts between the parties provided that they terminated upon the death of Philip Carmichael, Adirondack was under a duty to treat Plaintiffs fairly and in good faith. Adirondack had a duty to advise Plaintiffs whether it would agree to enter into a new contract with them or to allow Plaintiffs a reasonable opportunity to find a buyer for the distributorship or to decide to sell their interest in the distributorship to Adirondack.

Adirondack claims for the first time on appeal that the instruction in effect created substantive duties that the parties had not bargained for in their original contract. Not only did Adirondack waive any objection it had to the language of the instruction, we believe the "duties" specified in the instructions, given the nature of the business relationship, arose under the termination provision of the parties' contract by the implication of fair dealing and good faith.

The context in which the jury was asked to judge involved a contract featuring a "key man" termination clause and a number of post-termination obligations demanding reasonable accommodations in winding up the parties' affairs and accounting for assets. For instance, the contract provided for returning deposits, cooperating in locating equipment in the field, turning over business records, and implementing a covenant not to compete. All of these activities contemplated continued interaction of the parties after the "key man" provision had triggered the termination of the existing contractual arrangement. All of this post-termination activity was subject to good faith and fair dealing. Although the "key man" provision may have spelled an end to the parties' contractually contemplated business-as-usual, the provision did not extinguish the context of prior dealings between the parties. These dealings might have legitimately led Janet Carmichael to expect that Adirondack might negotiate a new agreement with her, or that it might arrange to buy her out at a fair price, or that it might allow her sufficient time to negotiate a sale of the business to a third party. Specific facts were presented at trial that evidenced the relational context within which the termination clause went into effect. The trial court's instruction simply asked the jurors to decide whether good faith and fair dealing were observed in this context. The evidence showed that Adirondack knew Carmichael had just lost her husband and thus had incurred the sole responsibility for running the business and supporting her family; that Adirondack knew that Carmichael wanted to stay in business and arguably did not discourage her from thinking she could; that Adirondack knew that the price it was offering for the distributorship had previously been rejected; and that Adirondack imposed unreasonably short deadlines on Carmichael for making an important and complex business decision. The

court's instruction captured the substance of the implied promise of good faith and fair dealing described in the Restatement. We see no error in the instruction.

█ It is settled law that "[g]eneral verdicts should be construed to give them effect, if that can reasonably be done." *Vineyard Brands, Inc. v. Oak Knoll Cellar*, 155 Vt. 473, 481, 587 A.2d 77, 81 (1990). On appeal, we view the facts in the light most favorable to Janet Carmichael, who prevailed at trial. The relevant question before us, however, is whether a jury reasonably could have found that Adirondack's conduct amounted to a breach of the implied covenant of good faith and fair dealing. In our opinion, the trial record contained sufficient evidence to support the jury's verdict, provided that it chose to believe Janet Carmichael's testimony. "[I]f the verdict is justified by 'any reasonable view of the evidence, it must stand.'" *Claude G. Dern Elec., Inc. v. Bernstein*, 144 Vt. 423, 426, 479 A.2d 136, 138 (1984) (quoting *Crawford v. State Highway Bd.*, 130 Vt. 18, 25, 285 A.2d 760, 764 (1971)). It was not error to deny Adirondack's motion for a directed verdict.

## III.

█ Next, Adirondack argues that Carmichael was not entitled to a jury instruction on punitive damages for two reasons: (1) Adirondack had no notice that such damages were an issue because the applicable count of the complaint did not request them and, (2) the evidence did not support punitive damages. To preserve the issue for review, however, "defendant must object to the charge 'before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection.'" *Ainsworth*, 156 Vt. at 332–33, 592 A.2d at 875 (quoting V.R.C.P. 51(b), holding that failure to object to the presence of punitive damage instructions results in waiver of claim of error on appeal). Adirondack did not object to the giving of a punitive damage instruction on either ground. Even assuming the evidence was insufficient to charge the jury on punitive damages, the court instructed the jury on such damages without any communication from Adirondack that the instruction was unwarranted. Because the alleged error was not brought to the trial court's attention in time to correct it, it was waived.

## IV.

Adirondack also claims that the trial court erred in not submitting an instruction on the affirmative defense of accord and satisfaction. Adirondack's request for the instruction was based on a document signed by Carmichael in which she agreed to accept $5000 from Adirondack in exchange for the conveyance of a business telephone number, customer records, a mailbox, and miscellaneous business assets.

■ ■ The party asserting the accord-and-satisfaction defense must establish that: (1) the claim is disputed; (2) the party claiming the defense offered to pay less than the amount purportedly due; and (3) the other party accepted and retained the lesser amount offered in full settlement of the claim. *Eccomunity, Inc. v. Lussier*, 147 Vt. 276, 278, 514 A.2d 711, 713 (1986). By the time the jury received its instructions, the only claim remaining in this case was the alleged breach of the implied covenant of good faith and fair dealing. There was such scant evidence in the record to support a contention that Adirondack offered Carmichael $5000 to satisfy any claim resting on bad faith, that any finding of an accord and satisfaction would have been unsupportable as a matter of law. The $5000 was consideration for the items listed in the document she signed, and it did not reach, even by implication, a satisfaction of anything else. Accordingly, we find no error in the trial court's refusal to instruct the jury on accord and satisfaction.

## V.

■ Finally, Adirondack argues that the trial court used the wrong date to compute its award of prejudgment interest on the jury's award of compensatory damages. The court computed the prejudgment interest from the date of breach, January 18, 1988. Adirondack does not dispute the date of breach. Rather, it maintains that the court should have computed the interest either as of the date Carmichael first signaled a demand of payment, October 14, 1988, or as of the date Carmichael filed her suit, January 5, 1989.

The court's choice of the date of the contract breach was an appropriate exercise of its discretion. See V.R.C.P. 54(a); *Hall v. Miller*, 143 Vt. 135, 146, 465 A.2d 222, 228 (1983) (court has

discretion to award interest as long as damages are not so contingent as to be unsupportable). But cf. *Gilman v. Towmotor Corp.* 160 Vt. 116, 121, 621 A.2d 1260, 1263 (1992) (prejudgment interest not available on "soft" tort damages, such as pain and suffering).

*Affirmed.*