2004 VT 105

## Leigh LoPresti, M.D. v. Rutland Regional Health Services, Inc. f/k/a Rutland Regional Physician Group, Inc.

[865 A.2d 1102]

No. 03-222

Present: **Amestoy, C.J.,**[1] **Dooley, Johnson and Skoglund, JJ., and Gibson, J. (Ret.), Specially Assigned**

Opinion Filed October 22, 2004

---

[1] Chief Justice Amestoy sat for oral argument but did not participate in this decision.

*James A. Dumont* of *Law Office of James A. Dumont, P.C.*, Bristol, for Plaintiff-Appellant.

*Allan R. Keyes* of *Ryan Smith & Carbine, Ltd.*, Rutland, for Defendant-Appellee.

¶ 1. **Johnson, J.** Plaintiff, Dr. Leigh LoPresti, appeals from the superior court's summary judgment in favor of defendant, Rutland Regional Physician Group, Inc. (Physician Group), his former employer. Dr. LoPresti claims that he was fired for his refusal to refer his patients to certain other Physician Group doctors whom he believed provided substandard and unnecessary care to his patients. Dr. LoPresti claims that by firing him for this reason Physician Group violated compelling Vermont public policy and the implied covenant of good faith and fair dealing. Alternatively, he seeks damages under a promissory estoppel theory. Physician Group argued, and the trial court agreed, that because the written employment contract allowed for termination "with or without cause" after 180-day notice, the reasons for the firing were immaterial as a matter of law. The court granted summary judgment on all counts. We affirm the court's judgment on the implied covenant and promissory estoppel counts, but reverse and remand for further development and consideration of the public policy count.

¶ 2. In July 1994, Dr. LoPresti entered into a "Physician Employment Agreement" with Physician Group, a "Vermont NonProfit Corporation ... rendering professional services through those of its employees who are duly licensed to practice medicine in the State of Vermont." Physician Group is not a hospital; it is a business arrangement among a group of doctors. Physician Group employees receive a base salary plus incentive payments, group liability insurance, accounting, administrative and marketing services, support staff and office facilities. In exchange, Physician Group collects and retains the fees that patients pay to the doctors it employs.

¶ 3. Dr. LoPresti's contract was to continue until terminated in accordance with § 1.2 of the agreement. Notwithstanding any provision to the contrary, § 1.2 set out a number of different circumstances under which the agreement could be terminated. Section 1.2(c)(ii) states that the agreement could be terminated "[o]ne hundred eighty (180) days after written notice of termination with or without cause from either party to the other." The agreement also provides that Dr. LoPresti would render medical services primarily at the Manchester Family Health Center, "and at such other locations as mutually agreed between [Dr. LoPresti] and [Physician Group]."

¶ 4. As a primary care physician, Dr. LoPresti often had to refer patients to specialists for further care, and, as part of his referral responsibility, he would follow up with patients to assess their status after receiving specialized treatment. Dr. LoPresti began practicing in

the Rutland area in 1991. In his affidavit, Dr. LoPresti stated that, after several years in the area, he had familiarized himself with the practices of many area specialists. During the course of his practice with Physician Group, Dr. LoPresti developed concerns about the quality of care that some of his patients were receiving from particular Physician Group specialists. Dr. LoPresti alleged that one Physician Group doctor, Orthopedic Surgeon Doe,[2] was "performing unnecessary procedures unnecessarily hospitalizing patients." Dr. LoPresti also concluded that two other Physician Group specialists, Obstetrician Doe and Surgeon Doe, were "providing clearly substandard care" that had "actually harmed more than one patient." Though he routinely referred patients to other doctors within Physician Group, Dr. LoPresti greatly reduced the number of referrals he was making to the three specialists or stopped referring patients to them altogether. At one point, Physician Group's President, Thomas Huebner, apparently told Dr. LoPresti that Orthopedic Surgeon Doe was complaining about the small number of cases that Dr. LoPresti had been referring to him.

¶ 5. In 1998, Physician Group officials, including Mr. James Hagen, Dr. Robert Cross, and President Huebner, informed Dr. LoPresti that the Manchester office, where he worked with one other primary care physician, Dr. Leffel, might be closed due to insufficient revenue. Dr. LoPresti did not agree with Physician Group's revenue conclusions and proposed course of action. He requested, and was granted, a meeting with President Huebner and Physician Group's Medical Practice Committee (MPC).

¶ 6. At the July 1998 MPC meeting, Dr. LoPresti made a detailed presentation on the Manchester office revenue situation with suggestions for how it could be improved. After his presentation, Dr. LoPresti was asked to leave so that the MPC could meet in executive session. As a result of the July meeting, the MPC decided to move Dr. Leffel to another office, close the Manchester office, and terminate Dr. LoPresti's contract. The day after the MPC executive session, Huebner gave Dr. LoPresti written notice of termination pursuant to § 1.2(c)(ii) of his contract. Consistent with the terms of the contract, the letter of termination provided no explanation as to why Dr. LoPresti was being fired except to say that the decision was made

---

[2] For purposes of this case, Dr. LoPresti has assigned all the specialists in question with aliases which we have incorporated into our discussion.

"[a]fter seeking input from the Medical Practice Committee as well as the Board of Directors."

¶ 7. Despite its decision to terminate Dr. LoPresti, Physician Group did not ultimately close the Manchester office. Dr. LoPresti asserts that he was more senior than Dr. Leffel, was seeing more patients than she was, and that he participated on three Physician Group committees while Dr. Leffel did not serve on any. In addition, of all the Physician Group primary care physicians, Dr. LoPresti had received the highest satisfaction ratings from his patients. Thanks to Dr. LoPresti's high ratings, Physician Group received a financial award from the HMO Kaiser Permanente. Dr. Leffel had not received any comparable recognition. Dr. Leffel had, however, been making regular referrals to the Physician Group specialists that Dr. LoPresti avoided using.

¶ 8. Unsatisfied with the circumstances of his termination, Dr. LoPresti filed suit in July 2001 alleging breach of contract based on the implied covenant of good faith and fair dealing, wrongful discharge in violation of public policy, and promissory estoppel. Initially, Dr. LoPresti alleged that Physician Group retaliated against him for his frequent complaints regarding proposed benchmarks for physician profitability related to the number of patients a Physician Group doctor should see in one day.

¶ 9. Due to a number of scheduling conflicts, discovery proceeded very slowly. By deposing Dr. Cross, one of the physicians present during the MPC executive session when the MPC decided to terminate Dr. LoPresti, the doctor learned that there was perhaps another reason why he was terminated: his referral practices.

¶ 10. Of the Physician Group personnel who were at the MPC executive session and were deposed by Dr. LoPresti, only Dr. Cross could remember details of the one and one-half hour conversation that took place. Dr. Cross stated that the MPC "talked about Leigh's style of practice, Leigh's style of interacting with specialists in the area. And the feeling — and his interaction with other members of [Physician Group], and the feeling was that he hadn't created the relationship with the specialists to be optimistic that it would grow into the future." Dr. Cross also indicated that physicians from other offices lacked enthusiasm about the prospect of Dr. LoPresti joining them in the event that the Manchester office was closed. Dr. Cross testified that this feeling was "[m]ostly . . . based on that Leigh had created a lot of — I guess had created a lot of lack of support by the specialists in the Rutland area. As the person to lead that practice, there were a number

of specialists that thought Leigh ought not to be the head of the practice there." When asked to describe the nature of the concern raised by the specialists, Dr. Cross responded in part by stating that "he [Dr. LoPresti] could have consulted and utilized the specialists more for patient benefit." Prior to the MPC executive session, Dr. Cross had also heard complaints from certain specialists about the lack of referrals from Dr. LoPresti. Dr. Cross summed up the situation as one of "frustration and dissatisfaction among the specialists."

¶ 11. Based on these late-stage revelations, Dr. LoPresti sought to amend his complaint to incorporate the allegations that his termination was related to his referral practices.[3] Specifically, he alleged that his referral practices had been guided by both the American Medical Association's Principles of Medical Ethics (AMA Principles) and Physician Group's own internal Code of Ethics. He claimed that the implied covenant of good faith and fair dealing prohibited Physician Group from firing him for these reasons because doing so would undermine the parties' reasonable expectations about the contract's common purpose. Further, he claimed that clear and compelling public policy restrained Physician Group from firing him over his referral practices. He argued that his obligation to abide by the ethical code of his profession, thereby protecting his patients, took precedence over Physician Group's conflicting demands.

¶ 12. Physician Group moved for summary judgment on July 15, 2002. In its memorandum of law accompanying its motion, Physician Group argued that the contract provision requiring 180-day notice prior to no-cause termination controlled the dispute absolutely. Accordingly, it argued that its reasons for termination were immaterial

---

[3] We note that the status of plaintiff's motion to amend his complaint appears unresolved. At the November 14, 2002 hearing on defendant's motion for summary judgment and plaintiff's motion to amend his complaint, neither the parties nor the court engaged in any significant discussion of the motion to amend, even though the proposed amendments contain many of the case's central allegations. In the hearing's closing exchange, the judge stated: "Well, I'll take the motion for summary judgment under advisement. I'll grant the motion to amend for pro forma, if it becomes vital. If the summary judgment was granted, that would be the end of that. And I'll grant it pursuant to V.R.C.P. 15 pro forma." Thus, it appears that the court tentatively granted the motion to amend, subject to its decision on summary judgment. On appeal, both parties have referred to allegations and claims asserted in the amended complaint, notwithstanding the absence of a formal order from the trial court allowing the amendments. We assume that the trial court will formally resolve this matter on remand.

as a matter of law, notwithstanding the implied covenant of good faith and fair dealing or public policy restraints on contracts. It argued that no compelling public policy supported Dr. LoPresti's theory that Physician Group should have been prohibited from firing him because of his resistance to proposed benchmarks requiring Physician Group doctors to see a certain number of patients per day, or his ethical concerns about referring patients to certain specialists. Physician Group also argued that Dr. LoPresti's promissory estoppel claim must fail because that theory is unavailable when there is a written contract between the parties, as there was in this case. Further, in its reply memorandum to Dr. LoPresti's memorandum in opposition to summary judgment, Physician Group argued that "[p]laintiff has not produced admissible evidence of specific facts to show a genuine issue for trial as to the alleged reason for termination."

¶ 13. After hearing oral argument from the parties, the trial court granted Physician Group summary judgment. In its opinion and order, the court concluded that Dr. LoPresti's assertions regarding the causal connection between his discharge and his refusal to refer to specialists based on professional ethical objections were immaterial and did not alter the right of either party to terminate the agreement for any reason. The only facts that the court considered relevant were the written contract between the parties containing the "with or without cause" termination clause and Physician Group's compliance with the clause's terms when it terminated Dr. LoPresti. The court ruled that the reasons why Physician Group terminated Dr. LoPresti were "moot, as a matter of law." The court also noted that Dr. LoPresti's complaint had been filed more than one and one-half years earlier, and on summary judgment, "other than Dr. LoPresti's conclusory allegations, there [was] no evidence of bad faith in [Physician Group]'s utilization of the explicit termination clause of the employment contract." For the reasons set forth below, we disagree in part with the trial court's ruling, and so reverse and remand for further proceedings.

¶ 14. We review a trial court's decision on summary judgment de novo, applying the same standard as the trial court. *White v. Quechee Lakes Landowners' Ass'n*, 170 Vt. 25, 28, 742 A.2d 734, 736 (1999). Summary judgment is appropriate only when there are no genuine issues of material fact and a party is entitled to judgment as a matter of law. *Id.*

¶ 15. Before the trial court could rule on the summary judgment motion, the parties alerted the court to a stipulation they had reached,

limiting the issues before the court for purposes of the motion. At the outset of oral argument on the motion, Physician Group's counsel engaged in the following exchange with the court:

> MR. KEYES: Part of the reason is that counsel, we're in the process of trying to narrow the issues and we did reach an agreement that was kind of contingent on the timing of the court's consideration. . . .

> TRIAL COURT: Have you done adequate discovery? There seem to be discovery issues that one party, probably the Plaintiff raised, that discovery hadn't been completed to the extent where they could raise an argument to your motion.

> MR. KEYES: Right. That's where we've reached the agreement. Our motion was basically in two parts, as a matter of law, even assuming you can prove the facts you allege, you're not entitled to relief. And part two was, you can't prove the facts you allege, you don't have sufficient evidence with specificity required by the rule to prove those facts. And because Mr. Dumont still has several depositions that he intends to complete, *we've agreed to withdraw without prejudice that second part of the argument.*

(Emphasis added.)

¶ 16. Contrary to this stipulation, Physician Group urges this Court to affirm the grant of summary judgment on grounds that Dr. LoPresti lacks admissible evidence to support an essential element of his case — the very ground it withdrew before the trial court's decision. We decline to consider arguments on appeal that were withdrawn in the trial court. See *Morais v. Yee,* 162 Vt. 366, 372, 648 A.2d 405, 410 (1994) (argument not raised before the trial court will not be considered on appeal). We will abide by the stipulation reached by the parties and limit ourselves, as the trial court largely did, to the issues of law raised by Dr. LoPresti's amended complaint.[4] Accord-

---

[4] Dr. LoPresti filed a Verified Motion to Alter or Amend the court's judgment based on his view that the trial court had ignored the parties' stipulation in ruling on summary judgment. In his motion, Dr. LoPresti reiterated the discovery problems that had plagued the case, and which the court knew were the reason for the stipulation. The motion also stated with specificity the discovery that remained to be completed. Dr. LoPresti pointed out that summary judgment should not be granted where the

ingly, we have assumed the truth of Dr. LoPresti's allegations as they pertain to his claims. As we discuss below, we affirm the trial court's ruling on the doctor's promissory estoppel and breach-of-the-implied-covenant-of-good-faith claims as a matter of law, but we reverse and remand for further proceedings on his claim of wrongful discharge in violation of public policy.

## I. Wrongful Discharge in Violation of Public Policy

¶ 17. For purposes of our de novo summary judgment review, defendant has provisionally agreed that the Court may assume as true Dr. LoPresti's allegation that he was terminated because he refused to refer patients to certain physicians whom he believed provided substandard care to his patients and in some cases performed unnecessary invasive procedures. Dr. LoPresti claims that his decision not to refer patients to these specialists was guided heavily by Vermont's prohibition on unprofessional conduct contained in 26 V.S.A. §§ 1354, 1398, and by numerous provisions of the AMA Principles. Dr. LoPresti asserts that his employers wanted him to make the referrals for financial reasons, notwithstanding the prohibition of such practices contained in the aforementioned ethical codes. He alleges that a discharge based on these grounds violates compelling public policy that restricts an employer's otherwise unfettered discretion to discharge employees. See *Payne v. Rozendaal*, 147 Vt. 488, 491-92, 520 A.2d 586, 588 (1986) (recognizing public policy limits on employer discretion in discharging employees). The trial court summarily rejected this argument because, in its view, this case was clearly governed by the termination clause in Dr. LoPresti's employment contract. Without analysis, the trial court also cited our decision in *Dulude v. Fletcher Allen Health Care, Inc.*, 174 Vt. 74, 807 A.2d 390 (2002), as additional, alternative support for its conclusion that no public policy prohibited Dr. LoPresti's firing, even if it were for the reasons that he alleged.

---

nonmoving party has not had adequate opportunity for discovery. See V.R.C.P. 56(f) (court may refuse to grant summary judgment where nonmoving party can show reasons why essential affidavit facts are not available); see also *Doe v. Doe*, 172 Vt. 533, 534-35, 768 A.2d 1291, 1292-93 (2001) (mem.) (summary judgment was premature when no discovery had occurred). In its Opinion and Order denying Dr. LoPresti's Motion to Vacate or Amend, the court made clear that because "Defendant moved for summary judgment as a matter of law . . . the reasons for plaintiff's termination are irrelevant as a matter of law."

## A.

■ ¶ 18. As an initial matter, we cannot accept the trial court's apparent holding that the existence of and adherence to a "with or without cause" termination provision of an express contract is sufficient to insulate an employer from a claim that it discharged an employee for reasons that violate public policy. In the employment context, Vermont law has long recognized that, under an at-will employment contract, "an employee may be discharged at any time with or without cause, 'unless there is a *clear and compelling* public policy against the reason advanced for the discharge.'" *Payne*, 147 Vt. at 491, 520 A.2d at 588 (quoting *Jones v. Keogh*, 137 Vt. 562, 564, 409 A.2d 581, 582 (1979)). Clause 1.2(c)(ii) of the "Physician Employment Agreement" states that, notwithstanding any provision to the contrary, the "Agreement shall terminate . . . One Hundred Eighty (180) days after written notice of termination with or without cause from either party." As Physician Group argues, this clause afforded Dr. LoPresti the security of six months in which to close out his practice and make arrangements to find new employment. This distinguishes the doctor's contract from the typical at-will employment relationship that is terminable immediately. See *Sherman v. Rutland Hosp., Inc.*, 146 Vt. 204, 207, 500 A.2d 230, 232 (1985) (at-will employment agreement can be terminated at any time with or without cause). Nonetheless, the agreement still left the employer with the power to fire him "with or without cause." Such employer discretion is the defining characteristic of the at-will relationship. See *Payne*, 147 Vt. at 491, 520 A.2d at 588. Accordingly, the distinction that Physician Group draws between the contract provision at issue in this case and at-will agreements controlled by *Payne* is immaterial.

¶ 19. In *Payne*, we expressly recognized that an employer's contract rights with regard to terminating an employee "are not absolute," and must yield to public policy considerations. *Id.* While we have not expressly extended this principle to written employment contracts that require a notice period before no-cause termination, we see no reason why it does not apply in such cases. Vermont law has long held that courts have the power to void written contract provisions that violate public policy in either their terms or contemplated performance. See *Baldwin v. Coburn*, 39 Vt. 441, 444-46 (1867) (voiding written contract between liquor commissioner and agents he appointed as against public policy). Such contract terms can be voided as against public

policy only when "it could be said that they were injurious to the interests of the public or contravened some established interest of society." *State v. Barnett*, 110 Vt. 221, 232, 3 A.2d 521, 526 (1939).

¶ 20. Without analysis or citation to *Payne*, the trial court "refuse[d] to treat this discharge as a violation of public policy" because it "is clearly governed by the termination clause." Defendant amplified this position by pointing out that the six-month provision evidences the doctor's substantial bargaining power in the contract and argues that the Court, "as conscience of the community, does not have to supply terms to protect the doctor." This argument fails to grasp the nature of public policy restraints on contract, which are enforced to protect community norms for the benefit of the public at large, as well as the individual employee. *Rocky Mtn. Hosp. & Med. Serv. v. Mariani*, 916 P.2d 519, 525 (Colo. 1996) ("[P]ublic policy must concern behavior that truly impacts the public in order to justify interference into an employer's business decisions."). In his amended complaint, Dr. LoPresti claims that he was fired for his refusal to potentially violate state law and his professional ethical code by referring patients to doctors whom he believed were "providing improper care, potentially jeopardizing the physical well-being of his patients." Assuming that he can prove these allegations, the enforcement of public policy here would have a tangible connection to the protection of health care consumers. Therefore, Dr. LoPresti's claim is consistent with our view that compelling public policy is intended to prevent injuries to the public — especially in matters of public health. See *Payne*, 147 Vt. at 492, 520 A.2d at 588 ("[public policy] may be said to be the community common sense and common conscience, extended and applied throughout the state to matters of public morals, public health, public safety, public welfare, and the like.") (quotation and citation omitted).

¶ 21. Our law specifically recognizes public policy limits on employer discretion in at-will situations. And it recognizes that, in the appropriate case, all written contract provisions may be voided as against public policy if the terms as written or actually performed could be injurious to the public. Accordingly, the trial court erred in concluding that the written contract provision in this case insulated the employer from Dr. LoPresti's claim that the termination decision violated public policy.

## B.

¶ 22. Having decided that the existence of the written employment contract in this case will not, as a matter of law, preclude a determination that Physician Group wrongfully terminated Dr. LoPresti in violation of public policy, we must now assess whether Dr. LoPresti has identified clear and compelling public policy to support his claim. In *Payne*, we recognized that public policy in the employment context may be found in sources other than statutes and constitutions. *Id.* at 493-94, 520 A.2d at 589 (rejecting notion that public policy exception to at-will employment must be legislatively defined). Other jurisdictions recognize that professional ethical codes can be an important source of public policy in employment matters involving employees who are subject to the mandates of such codes. *Mariani*, 916 P.2d at 524-25 (relying on state professional accountancy ethical codes as source of public policy in wrongful discharge case); *Pierce v. Ortho Pharm. Corp.*, 417 A.2d 505, 513-14 (N.J. 1980) (accepting professional codes of ethics as source of public policy, but rejecting wrongful discharge claim of doctor who failed to prove that conduct requested by employer would lead to an ethical violation). In *Pierce*, the New Jersey Supreme Court observed that "[e]mployees who are professionals owe a special duty to abide not only by federal and state law, but also by the recognized codes of ethics of their professions. That duty may oblige them to decline to perform acts required by their employers." 471 A.2d at 512; see also *Mariani*, 916 P.2d at 525 ("[E]thical codes are central to a professional employee's activities, there may be a conflict at times between the demands of an employer and the employee's professional ethics.").

¶ 23. We agree, as a general matter, with those courts that accept professional ethical codes as potential sources of public policy. Nonetheless, employees who invoke such codes, as Dr. LoPresti has, still bear the burden of demonstrating that such codes are "clear and compelling" in their mandates to employees who claim that their professional ethical obligations supersede those owed to their employers. *Payne*, 147 Vt. at 495, 520 A.2d at 590. Specifically, employees must show that the ethical provisions relied on are "sufficiently concrete to notify employers and employees of the behavior [they require]," and the code provision being applied must be primarily for the benefit of the public as opposed to the interests of the profession alone. *Mariani*, 916 P.2d at 525; accord *Pierce*, 417 A.2d at 512. The

employee must show that he had an objective, good faith belief that the conduct requested by the employer would violate an ethical rule that satisfies the preceding definition. To succeed, an employee cannot rely on his or her personal moral beliefs, or on an overly cautious reading of the mandates in a particular code. *Pierce*, 417 A.2d at 512 ("[A]n employee should not have the right to prevent his or her employer from pursuing its business because the employee perceives that a particular business decision violates the employee's personal morals, as distinguished from the recognized code of ethics of the employee's profession.").

■ ¶ 24. Moreover, in a case like this one, a professional employee must show that the specific provisions contained in the ethical code relied upon apply in the particular professional context in which the employee is working. Here, for example, Dr. LoPresti relies on Principle E-8.132 among others. By its terms, Principle E-8.132 governs a central issue in this case: referral practices of physicians. Much of its operative language, however, specifically addresses the financial pressures that a physician faces when dealing with patients who belong to Preferred Provider Organizations (PPO) and Health Maintenance Organizations (HMO). As the Court understands it, Physician Group is neither a PPO, nor an HMO. Principle E-8.132 specifically references "referral to outside specialty services," as opposed to those available within the PPO or HMO. Because the court summarily rejected Dr. LoPresti's public policy claim without examining or applying this and other ethical provisions in question, the record and briefing contain very little detail about the organizational structure of Physician Group and its expectation of employees as they pertain to referrals. Without knowing how Physician Group handled referrals, it is difficult for this Court to apply an ethical provision, most of which is addressed to physicians working within the constraints of an HMO or PPO.

¶ 25. On remand, Dr. LoPresti must carry the foregoing burdens with respect to the AMA Principles he relies on, and then must show that he can satisfy the elements of wrongful discharge in violation of public policy as they are set out below.

¶ 26. In *Mariani*, the Colorado Supreme Court held that an employee's wrongful discharge claim could be based on public policy found in professional ethical codes. 916 P.2d at 525. The court set out four elements of the prima facie case for such claims. *Id.* at 527. The employee must show that (1) the employer directed the employee to perform an illegal or unethical act as part of the employee's duties; (2)

the action directed by the employer would violate a statute or clearly expressed public policy; (3) he or she was terminated as a result of refusing to perform the requested act in violation of public policy; and (4) "the employer was aware or should have been aware that the employee's refusal was based upon the employee's reasonable belief that the act was illegal" or in violation of the employee's professional ethical code. *Id.*

## C.

¶ 27. Despite the trial court's citation to it, our holding in *Dulude v. Fletcher Allen Health Care* is addressed to a situation that is materially different from the present case, and thus is not an obstacle to Dr. LoPresti's claim. In *Dulude*, we held that, as a matter of law, a nurse's professional disagreements with the employer hospital's narcotics practices were insufficient to support a public policy claim. *Dulude*, 174 Vt. at 82, 807 A.2d at 397. Prior to her ultimate termination, nurse Dulude's discretion in dispensing narcotics to patients had been curtailed significantly in response to patient complaints and an internal audit indicating that her medication practices were aberrant. *Id.* at 76-77, 807 A.2d at 393. The nurse was under strict supervision, and was required to obtain approval from a support person prior to administering any controlled substance. *Id.* Multiple letters of understanding between the nurse and the hospital clearly indicated that any deviation from the hospital's pain medication policies would result in her termination. *Id.* at 77-78, 807 A.2d at 393-94. Despite these warnings, the nurse deviated from the hospital pain medication policy several times and on occasion failed to obtain necessary approval from a support person. *Id.* Under these circumstances, we refused to accept the plaintiff's claim that public policy prevented the hospital from lawfully firing her, even though she had repeatedly violated hospital policy set by her supervisors.

¶ 28. In reaching our conclusion that public policy would not prevent the employer's termination decision, we emphasized that "[a]s a licensed hospital in Vermont, FAHC has the ultimate responsibility to provide for, and protect, its patients, and to set its own standards for safeguarding the life and health of the people of this state." *Id.* at 82, 807 A.2d at 397. We also cited to *Aiken v. Employer Health Serv., Inc.*, No. 95-3196, 1996 WL 134933, at *6 (10th Cir. March 23, 1996), for the proposition that there is no "public policy which prohibits an employer from terminating a health care employee over a disagreement or

difference of professional judgment where the judgment of each is within the bounds of reasonable care." *Id.* (internal quotations omitted). This is not the case here.

¶ 29. The substantial difference in professional status between the nurse in *Dulude* and Dr. LoPresti distinguishes the two cases. The nurse in *Dulude* worked as a hospital employee under the direct supervision of other licensed medical professionals — a status that afforded her less discretion over patient care decisions than that required of Dr. LoPresti, a primary care physician. Her job was to execute policies established by supervisors. *Dulude*, 174 Vt. at 77, 807 A.2d at 393. Time and again, she proved herself incapable of abiding by specific pain-medication-administration plans and directives from her supervisors. By contrast, as a primary care physician, Dr. LoPresti was solely responsible for deciding which of the various area specialists would best treat his patients. Nothing in the record before us indicates that he was expected or required to receive approval from supervisors before making referrals.

¶ 30. Moreover, Dr. LoPresti has alleged more than a "'difference of professional judgment where the judgment of each [party] is within the bounds of reasonable care.'" *Id.* at 82, 807 A.2d at 397 (quoting *Aiken*, 1996 WL 134933, at *6). Dr. LoPresti claims that specific provisions of the AMA Principles set strict guidelines governing physician referral practices. Dr. LoPresti believes that he will be able to prove, with additional discovery, that his refusal to violate the codified ethical standards of his profession solely for the financial benefit of his employers led to his discharge. The nurse in *Dulude* made no claim that her aberrant medication practices were mandated by any professional ethical code. *Id.* Instead, she was following nothing more than her own personal philosophy of pain-medication administration, and the appellate record revealed that her practices were the source of numerous patient complaints. *Id.* at 76-78, 807 A.2d at 392-94.

¶ 31. Because Dr. LoPresti's claim, as alleged, is materially distinguishable from the claim brought in *Dulude*, the trial court erred by citing it as additional support for its conclusion that Dr. LoPresti's public policy count could not succeed as a matter of law.

¶ 32. Due to the undeveloped state of the record as it pertains to this claim, we express no opinion as to Dr. LoPresti's ability to satisfy the elements articulated above. At this stage, we acknowledge only that, contrary to the trial court's legal conclusions, Dr. LoPresti's amended

complaint has stated a claim upon which relief can be granted, assuming that he can support it with admissible evidence.

¶ 33. Dr. LoPresti has also alleged that the conduct that Physician Group required of him would have violated Vermont law regulating the practice of medicine. Specifically, Dr. LoPresti relies on 26 V.S.A. §§ 1354(a)(7), 1398. Section 1354(a)(7) states that unprofessional conduct includes "conduct which evidences unfitness to practice medicine." Section 1398 allows the Board of Medical Practice to suspend or revoke licenses of doctors who engage in unprofessional conduct. Dr. LoPresti argues that a violation of a professional ethical code, like the AMA Principles, can amount to "unfitness to practice medicine." See, e.g., *Shea v. Bd. of Med. Exam'rs*, 146 Cal. Rptr 653, 662 (Ct. App. 1978) (unfitness to practice medicine is evidenced by "conduct which breaches the rules or ethical code of [doctor's] profession"). Dr. LoPresti cites no case in which the Vermont Board of Medical Practice has actually interpreted the statutory language as he does. The board is entrusted with enforcing the statute in the first instance, and it does so in the context of cases where the specific facts amounting to allegedly unprofessional conduct are before it. We are, therefore, hesitant to usurp the board's role by issuing an advisory opinion on the type of conduct that would not be "unprofessional" as that term is used in the statute. While we are allowing further proceedings in which Dr. LoPresti will have the chance to prove that the AMA Principles, standing alone, are clear and compelling public policy that controlled the employer's termination decision, we decline Dr. LoPresti's invitation to incorporate the AMA Principles into 26 V.S.A. § 1354(a)(7).

¶ 34. Finally, we reject the aspect of Dr. LoPresti's public policy claim that relies on certain provisions of Physician Group's own "Code of Ethics." Our review of the policy provisions that Dr. LoPresti relies on leads us to the conclusion that they are "broad hortatory statement[s] of policy that give[] little direction as to the bounds of proper behavior," and thus do not comply with the public policy standards we set out above.[5] *Mariani*, 916 P.2d at 525.

---

[5] For example, Dr. LoPresti argues that the referrals Physician Group wanted him to make would have violated Physician Group Policy 1: employees "[s]hould recognize that the care of the sick is their first responsibility and a sacred trust, RRPG employees must at all times strive to provide the best possible care and treatment to all in need."

## II. Implied Covenant of Good Faith and Fair Dealing

¶ 35. Dr. LoPresti also claims that, notwithstanding the express "with or without cause" termination clause of his written contract, the implied covenant of good faith and fair dealing (the covenant) imposes limits on both the reasons and process for terminating an employee in his position. In Vermont, the covenant of good faith and fair dealing is implied in every contract. *Carmichael v. Adirondack Bottled Gas Corp.*, 161 Vt. 200, 208, 635 A.2d 1211, 1216 (1993); see also Restatement (Second) of Contracts § 205 (1981) (stating that the covenant is implied in every contract). Dr. LoPresti's theory has both a substantive and a procedural component which we will deal with separately.

### A. Substantive Protection of the Implied Covenant of Good Faith and Fair Dealing

¶ 36. "'[G]ood faith' is a concept that 'varies ... with the context' in which it is deemed an implied obligation." *Carmichael*, 161 Vt. at 208, 635 A.2d at 1216 (quoting Restatement (Second) of Contracts § 205 cmt. a (1981)) (omission in original). The covenant's purpose is to ensure "faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." Restatement (Second) of Contracts § 205 cmt. a (1981). Here, we are asked to imply the covenant in the context of an express physician's employment agreement allowing for termination on notice from either party "with or without cause."

¶ 37. As Dr. LoPresti views it, the agreed common purpose of the physician's employment contract was providing the highest possible quality of patient care. He argues that "[a] jury would be entitled to find that firing a doctor because he had upheld the ethical standards of his profession by taking reasonable steps to protect his patients from harm violates the covenant," as it applies to the agreed common purpose he posits. In this respect, his claim based on a violation of the covenant is practically indistinguishable from his public policy claim discussed above. This point is illustrated by the following statements Dr. LoPresti's counsel made at the oral argument on summary judgment in the trial court:

> The covenant of good faith and fair dealings is a very strong part of Vermont law that stands on equal footing with FEPA [the Vermont Fair Employment Practices Act]. There's some protections for the public that really [] the contracts can['t]

outweigh. *Our argument about the compelling public interest, the compelling public policy is pretty much the same.* I wouldn't make the argument if what Dr. LoPresti did was just to protect his own rights or his own interests.

(Emphasis added.)

¶ 38. In the employment termination context, some courts have also recognized the difficulty of distinguishing between violations of the covenant and wrongful termination in violation of public policy. For example, in the seminal case of *Monge v. Beebe Rubber Co.*, the New Hampshire Supreme Court applied the covenant and held that an employer had violated it by terminating an at-will employee who refused to date her foreman. 316 A.2d 549, 551-52 (N.H. 1974). The court stated that "termination by the employer of a contract of employment at will which is motivated by bad faith or malice . . . constitutes a breach of the employment contract." *Id.* at 551. In a subsequent case, however, the court clarified that *Monge* applied "only to a situation where an employee is discharged because he performed an act that public policy would encourage, or refused to do that which public policy would condemn." *Howard v. Dorr Woolen Co.*, 414 A.2d 1273, 1274 (N.H. 1980). In concurring with the Idaho Supreme Court's decision to recognize the applicability of the covenant in the at-will employment context, Associate Justice Huntley discussed the interplay of the covenant and public policy as he saw it:

> When the contract is "at will," the employer need not show good cause for the termination. However, the "at will" employer may not terminate an employee for bad causes or reasons, *i.e., those contrary to public policy*, because such terminations are made in bad faith, and as such, are in contravention of [the covenant].

*Metcalf v. Intermountain Gas Co.*, 778 P.2d 744, 752 (Idaho 1989) (Huntley, J., concurring) (emphasis added). We see no reason, in the context of this case, to blur the distinction between harms for which the covenant provides a remedy and harms for which public policy provides a remedy. We will not, therefore, allow Dr. LoPresti's claim for breach of the covenant, as he has fashioned it, to go forward.

¶ 39. More importantly, we have already held that the covenant does not apply to at-will employment agreements when the plaintiff's argument amounts to no more than an objection to the other party's

freedom to avail itself of the at-will arrangement by terminating the agreement for reasons that the other party does not accept. *Dicks v. Jensen*, 172 Vt. 43, 52, 768 A.2d 1279, 1285-86 (2001). While the agreement at issue here is not truly at-will in the sense that there is a written contract that requires a notice period before no-cause termination, we have treated them as equivalents for the reasons stated *supra* ¶ 18. Accordingly, the rationale behind our rejection of the employer's claim in *Dicks* applies here.

¶ 40. Though writing in the context of classic at-will employment arrangements, the Supreme Court of Connecticut summarized what is our essential position in this case:

> Although we endorse the applicability of the good faith and fair dealing principle to employment contracts, its essence is the fulfillment of the reasonable expectations of the parties. Where employment is clearly terminable at will, a party cannot ordinarily be deemed to lack good faith in exercising this contractual right. Like other contract provisions, which are unenforceable when violative of public policy, the right to discharge at will is subject to the same restriction. We see no reason presently, therefore, to enlarge the circumstances under which an at-will employee may successfully challenge his dismissal beyond the situation where the reason for his discharge involves "impropriety ... derived from some important violation of public policy."

*Magnan v. Anaconda Indus., Inc.*, 479 A.2d 781, 788-89 (Conn. 1984) (internal citation omitted).

¶ 41. Above and beyond the allegations that Physician Group fired him in violation of public policy, Dr. LoPresti also claims that he was fired because he demanded a higher standard for patient care than Physician Group was interested in providing. His specific allegations were related not only to the referral issue, but also to clashes he had with management over the number of patients a Physician Group doctor would be required to see in a day. He claims that termination for this reason was inconsistent with his justified expectations under the contract that incorporated the notion, contained in Physician Group's own code of ethics, that "care of the sick" was the physician's "first responsibility" and "sacred trust." See *Carmichael*, 161 Vt. at 208, 635 A.2d at 1216 (covenant emphasizes "'consistency with the justified expectations of the other party'") (quoting Restatement (Second) of Contracts § 205 cmt. a (1981)). Assuming that Dr. LoPresti

can prove this allegation, as a matter of law, the covenant still will not provide a remedy where the express contract makes both parties aware that either party can terminate the agreement, upon proper notice, for any reason. Putting aside the public policy aspect, Dr. LoPresti's claim under the covenant is based on his not unwarranted dissatisfaction with the reasons he believes were behind his firing. We cannot recognize this as an acceptable ground on which to challenge employer personnel decisions that are based on freely negotiated "with or without cause" termination clauses, because to do so would essentially render such clauses meaningless.

¶ 42. We note, however, that our holding in this case will not necessarily preclude the covenant's application in the employment termination context when a plaintiff's claim for damages is based on "accrued benefits" and not solely on implied tenure, i.e., permanent employment until just cause for termination arises. See *Ross v. Times Mirror, Inc.*, 164 Vt. 13, 23, 665 A.2d 580, 586 (1995) (reserving judgment on whether Court would recognize the covenant in the context of nontenure terms of at-will contract). Even when the employment arrangement gives the employer absolute discretion to terminate the contract without cause, courts have held employers liable for breaching the covenant where the termination was based on the employer's desire to avoid paying the employee benefits earned under the contract. See, e.g., *Fortune v. Nat'l Cash Register Co.*, 364 N.E.2d 1251, 1255-57 (Mass. 1977) (notwithstanding written contract allowing either party to terminate the contract on written notice, employer violated implied covenant of good faith and fair dealing by terminating employee in order to avoid paying him commissions and bonuses to which he would have been entitled but for the termination); see also *Magnan*, 479 A.2d at 787-88 (expressing a willingness to accept employee claims based on implied covenant of good faith and fair dealing when the employer's termination decision has the effect of "depriving the employee of compensation that is clearly identifiable and is related to the employee's past service.") (internal quotation marks omitted). Such cases are based on the principle that "any action by either party which violates, nullifies or significantly impairs any benefit of the employment contract is a violation of the implied-in-law covenant of good faith and fair dealing." *Metcalf*, 778 P.2d at 750; see also Restatement (Second) of Contracts § 205 cmt. a (1981) (covenant emphasizes "consistency with the justified expectations of the other party").

¶ 43. Dr. LoPresti's claim does not require us to apply the covenant to restore accrued benefits that were lost as a result of his being fired. He cannot claim that Physician Group deprived him of any benefit of the employment contract by terminating him when it did. The contract required only that Dr. LoPresti be given written notice of termination six months in advance, and the opportunity to work for the contracted salary during the period following the notice until the date of termination. He does not dispute that he was given this notice, nor does he dispute that he was paid for all the services he rendered. Moreover, in light of the freely negotiated "with or without cause" termination clause, lifetime employment was clearly not a benefit of the contract.

## B. Procedural Protection of the Implied Covenant of Good Faith and Fair Dealing

¶ 44. Dr. LoPresti's claim that Physician Group breached the covenant by employing a bad faith process in firing him is similarly unavailing. To the extent that Physician Group provided him with a reason for his termination,[6] ostensibly that the office where he worked was being closed, he argues that this was a pretext for the real reason he was terminated — failure to refer patients to certain specialists. He argues that this alleged subterfuge "deprived him of the opportunity to protect his rights," because he would have made a greater effort to explain his referral practices in hopes of reversing Physician Group's decision to terminate him. The flaw in this argument lies in Dr. LoPresti's suggestion that he had the "right" to permanent employment absent just cause for termination. The contract makes clear that he had no such right.

¶ 45. In *Carmichael*, we accepted the Restatement's view that "'[s]ubterfuges and evasions violate the obligation of good faith in performance even though the actor believes his conduct to be justified.'" 161 Vt. at 209, 635 A.2d at 1217 (quoting Restatement (Second) of Contracts § 205 cmt. d (1981)). Again, we stress that the covenant's application varies with the context. *Dicks v. Jensen*, 172 Vt. at 52, 768 A.2d at 1285-86; *Carmichael*, 161 Vt. at 202, 635 A.2d at 1213. As a general matter, we discourage any subterfuge and evasion in employer/employee relations. Nonetheless, when, as here, the employ-

---

[6] The written notice informing Dr. LoPresti that he was being terminated in accordance with § 1.2(c)(ii) did not state any reason for the firing.

er has no duty to provide the employee with any reason why he or she is being fired, subterfuge and evasions, though they may be reprehensible, are not actionable. Dr. LoPresti could have negotiated for terms that would have required Physician Group to provide him not only with notice prior to termination under § 1.2(c)(ii), but also with the reason for the termination decision. In fact, under Dr. LoPresti's physician's agreement § 1.2(c)(i), either party could terminate the agreement ninety days after providing the other party notice of a material breach. In that case, the alternative termination clause contemplates that, after receiving notice of a material breach, the other party will work to cure it. If the breaching party can cure the breach within thirty days, then the contract will not terminate. The bargain Dr. LoPresti struck with Physician Group left both parties with the choice of at least two means to terminate the contract. Physician Group cannot be penalized for exercising its choice as it did, even when doing so deprived Dr. LoPresti of the opportunity to change the minds of Physician Group's decisionmakers.

¶ 46. While public policy could supersede the written termination provision in this employment contract, the implied covenant of good faith and fair dealing, as Dr. LoPresti has invoked it, will not. As we noted above, public policy restrictions on an employer's personnel decisions protect the public from conduct that transgresses widely held community values. Though the effect of its enforcement may be to protect a specific employee, its purpose is to deter conduct that is also directly or indirectly injurious to the public. To the extent that Dr. LoPresti invokes the implied covenant of good faith and fair dealing to perform a like function in this case, we decline to write this redundancy into the law. If Dr. LoPresti falls short of carrying his burden on the public policy theory, we will not accept his invitation to apply the covenant as a remedy for what he sees as the unduly harsh operation of a freely bargained contractual term; in this case, the arms-length bargaining process between professionals delivered sufficient protection.

### III. Promissory Estoppel

¶ 47. In reviewing Dr. LoPresti's promissory estoppel claim, the trial court correctly noted and applied the well-established rule that promissory estoppel will not apply when the relationship of the parties is governed by a contract. E.g., *Big G Corp. v. Henry*, 148 Vt. 589, 594, 536 A.2d 559, 562 (1987). In this case, the parties entered into a written

agreement and ostensibly performed according to its terms until it was terminated after approximately four years.

¶ 48. Dr. LoPresti attempts to avoid the bar to his promissory estoppel claim by arguing that the contract was unconscionable and illusory, or alternatively, that the contract was not formed because, due to a unilateral mistake, the parties did not reach the necessary "meeting of the minds." These sparsely briefed arguments are based on Dr. LoPresti's view that Physician Group and the trial court interpreted the contract in a way that left Physician Group "free to deliberately submit patients to substandard care, and free to substitute profit for patient care as the 'sacred trust.'" Dr. LoPresti argues that a "conscientious and careful physician" like himself would not have entered into such an agreement.

¶ 49. Our resolution of the legal issues involved in Dr. LoPresti's public policy claim makes clear that the contract does not permit Physician Group to require Dr. LoPresti to subjugate patient care to financial considerations when doing so would result in a violation of law or the AMA Principles. On the other hand, when viewed objectively, a reasonable person would have understood that the "with or without cause" termination provision in the contract allowed Physician Group to discharge Dr. LoPresti for failure to comply with employer practices even if those practices compromised his personal standards of patient care, but were otherwise ethical and lawful. Moreover, the termination clause also allowed Dr. LoPresti the freedom to leave Physician Group, after appropriate notice, if he did not agree with its practices. We decline, therefore, to hold that there was a defect in formation of the contract between the parties.

¶ 50. We affirm the trial court's conclusion that promissory estoppel is inapplicable to this case because the dispute arises out of a valid contract between the parties. See *Housing Vt. v. Goldsmith & Morris*, 165 Vt. 428, 431, 685 A.2d 1086, 1089 (1996) (promissory estoppel does not apply when contract governs the relationship of the parties).

*The superior court's grant of summary judgment for Physician Group on Dr. LoPresti's breach of contract and promissory estoppel claims is affirmed. The superior court's judgment as to Dr. LoPresti's claim of wrongful termination in violation of public policy is reversed and the case is remanded for additional proceedings consistent with the views expressed herein.*