**ROCKY MOUNTAIN HOSPITAL AND MEDICAL SERVICE, d/b/a/ Blue Cross and Blue Shield of Colorado, a Colorado corporation in good standing, Petitioner,**

v.

**Diana I. MARIANI, Respondent.**

No. 95SC209.

Supreme Court of Colorado,
En Banc.

April 29, 1996.

Kennedy & Christopher, P.C., Richard B. Caschette, Dean A. McConnell, Denver, for Petitioner.

Fowler, Schimberg & Cowman, P.C., Daniel M. Fowler, Catherine A. Tallerico, Katherine Taylor Eubank, Denver, for Respondent.

Truhlar and Truhlar, Doris B. Truhlar, Robert J. Truhlar, Littleton, Miller & Steiert, P.C., Leonard Segreti, Littleton, Jeffrey

Menter, Englewood, for Amicus Curiae Plaintiff Employment Lawyers Association— Colorado Chapter.

Mountain States Employers Council, Inc., Melanie Daly, Denver, for Amicus Curiae Mountain States Employers Council, Inc.

Justice KOURLIS delivered the Opinion of the Court.

We granted certiorari to review the court of appeals opinion in *Mariani v. Rocky Mountain Hospital & Medical Service*, 902 P.2d 429 (Colo.App.1994), reversing the trial court's grant of a directed verdict against the plaintiff, Diana Mariani, on her tort claim against her former employer, Colorado Blue Cross and Blue Shield (BCBS), for wrongful discharge in violation of public policy. The court of appeals held that the Colorado State Board of Accountancy Rules of Professional Conduct, specifically Rule 7.3, could establish public policy for purposes of a wrongful discharge claim. *Mariani*, 902 P.2d at 433. The court of appeals further held that Mariani had produced sufficient evidence during her trial to establish that BCBS fired her for refusing to violate this public policy. *Id.* at 434. We affirm.

## I.

Since this case was resolved on a directed verdict, the facts regarding Mariani's retaliatory discharge claim must be viewed in the light most favorable to Mariani.[1]

Diana Mariani is a licensed certified public accountant. In November of 1987, BCBS hired her as an at-will employee as manager of general accounting for their human resources department. In that position, Mariani had financial reporting responsibilities for the company. According to Mariani, those responsibilities included reporting all transactions involving the company's payroll expenses, premiums, revenues, and claims expense. In April of 1990, BCBS reassigned Mariani to the position of manager of special projects. In this new position, Mariani did not have any financial reporting responsibilities, but did have a general oversight role. Mariani remained an at-will employee of BCBS until her termination in February of 1991.

At trial, Mariani testified that during her employment with BCBS she discovered and complained to her supervisors about questionable accounting practices. Her concerns included her observation that reimbursed expenses, such as moving expenses, were not properly noted on some of the IRS reports that BCBS submitted. Mariani reported these concerns to her supervisor, Samuel Weidman.[2]

She further complained to her supervisor[3] that BCBS had reduced its fees for management services and office space charged to Rocky Mountain Life Insurance Company in order to make Rocky Mountain Life appear profitable and to preserve its B plus solvency rating. Mariani told her supervisor that the adjustment violated generally accepted accounting principles because the reports then misrepresented the financial status of Rocky Mountain Life. Her supervisor responded that the adjustment was a business decision.

When she became manager of special projects Mariani continued to object to BCBS's accounting practices. Mariani worked on two documents discussing the benefits of a proposed merger between BCBS, New Mexico Blue Cross and Blue Shield, and Nevada Blue Cross and Blue Shield. The documents were to be submitted to the Board of Directors of BCBS and ultimately to the Colorado Division of Insurance.[4] Mariani's supervisor, Weidman, told her that she should identify and describe benefits of the merger in the documents. Mariani informed Weidman that she was having difficulty uncovering any benefits of the merger. In response, Mariani asserts that Weidman told her she would be fired if she was unable to quantify

---

1. See *infra* part III. A, p.19.

2. Mariani's direct supervisor for both her positions and throughout most of her employment with BCBS was Samuel Weidman.

3. For a brief period applicable to this assertion, Mariani's supervisor was Joe Donahue.

4. Ultimately, the documents were not submitted to the Division of Insurance and were used only for internal reference by BCBS.

concrete benefits of the merger. Mariani attempted to uncover some benefits, although she was ultimately unsuccessful.[5]

Mariani further testified that she objected to some of the representations that her supervisors made about the benefits of the merger within the documents. Mariani explained that her supervisors deleted information she had included in the merger documents and substituted their own. Mariani further stated that she believed that her supervisors had made what she considered to be inappropriate omissions and misrepresentations in the merger documents.

Mariani testified that one of her duties was to compile a staffing analysis of New Mexico Blue Cross and Blue Shield. While compiling the analysis, Mariani discovered that BCBS had purchased a $3.5 million computer for New Mexico Blue Cross and Blue Shield. Mariani objected to this purchase because it was recorded as an asset on the books of New Mexico Blue Cross and Blue Shield. As an accountant, Mariani considered it improper for an asset purchased by one entity to be recorded on the books of another separate entity. Mariani further objected to BCBS not recording as liabilities certain discounts that BCBS owed to other companies. She claimed that the omission misled BCBS subscribers into believing that BCBS had more funds in reserve to pay claims than it actually had.

As a result of reviewing the Nevada Blue Cross and Blue Shield account, Mariani learned that Nevada had $1.5 million of duplicate claim liability. Mariani explained that between 1987 and 1990, Nevada had collected $1.5 million in overpayments but had not refunded the money. Mariani brought this to the attention of Weidman, her supervisor, who declined to take any action to remedy the situation. Lastly, while reviewing Nevada Blue Cross and Blue Shield's premium taxes, Mariani discovered that the entity was improperly taking a home office tax credit. Mariani reported to Weidman that Nevada Blue Cross and Blue Shield

was not entitled to that credit. Weidman told Mariani that Nevada Blue Cross and Blue Shield would take the credit anyway. Weidman ordered Mariani to turn the work papers over to someone else.

Mariani also complained about BCBS's treatment of non-admitted assets on its financial statement. A non-admitted asset is a receivable that is outstanding for more than ninety days. In 1988, BCBS had loaned New Mexico Blue Cross and Blue Shield $13.5 million through a surplus note. This note was not indicated on the BCBS financial statement as a non-admitted asset. She objected to Weidman about this practice. Weidman told her that he believed it was proper not to list the note as a non-admitted asset.

On February 19, 1991, BCBS fired Mariani. BCBS told Mariani that her job was being eliminated because of a restructuring within the finance department. Mariani testified that her dismissal was the direct result of her objections to BCBS' irregular accounting practices. On June 11, 1991, Mariani filed suit against BCBS and Weidman. She asserted five claims for relief: (1) breach of contract for wrongful discharge; (2) breach of implied contract and promissory estoppel for wrongful discharge; (3) retaliatory discharge in violation of the public policy exception to employment at-will; (4) tortious interference with contract by Samuel Weidman; and (5) outrageous conduct against Weidman.

At the close of Mariani's case, BCBS and Weidman made a Motion for a Directed Verdict. The district court directed a verdict against Mariani as to the breach of implied and express contract causes of action and the tortious interference with contract cause of action. The district court reserved judgment on Mariani's promissory estoppel claim until the end of the trial and ruled that the outrageous conduct cause of action against Weidman should be submitted to the jury.

In addition, the district court directed a verdict against Mariani on her claim of retaliatory discharge in violation of public policy.

---

5. Mariani testified that the reason she could not find any benefits for the merger was that both Nevada Blue Cross and Blue Shield and New Mexico Blue Cross and Blue Shield were insol-

vent. Thus, there would be no financial benefit for Colorado BCBS to merge with these other companies.

Relying on *Martin Marietta v. Lorenz*, 823 P.2d 100 (Colo.1992), the trial court ruled that in order to establish a prima facie case of wrongful discharge in violation of public policy, Mariani must allege that BCBS had asked her to violate a specific public policy. In her complaint, Mariani relied on the following sources of public policy to make her claim: 18 U.S.C. § 1001 (1988) which prohibits the making of false statements to federal agencies; section 24-34-402, 10A C.R.S. (1995 Supp.), which provides a cause of action and remedies for discriminatory and unfair employment practices; section 10-16-102, 4A C.R.S. (1994), which provides statutory definitions for the Colorado Health Care Coverage Act; and the Colorado State Board of Accountancy Rules of Professional Conduct. The trial court considered each of these sources of public policy and held that none of them could support Mariani's claim for wrongful discharge in violation of public policy.

After trial, the jury found for BCBS and Weidman on Mariani's outrageous conduct claim. The trial court ruled that Mariani had failed to prove her claim of promissory estoppel and entered final judgment for BCBS and Weidman on all counts.

Mariani appealed the dismissal of her claims to the court of appeals. The court of appeals upheld the trial court's ruling regarding Mariani's implied contract and promissory estoppel claims. *Mariani v. Rocky Mountain Hosp. & Medical Serv.*, 902 P.2d 429, 434-36 (Colo.App.1994). The court of appeals reversed the directed verdict for BCBS on Mariani's claim that she had been wrongfully discharged in violation of public policy. The court of appeals held that the Colorado State Board of Accountancy Rules of Professional Conduct, specifically Rule 7.3, was sufficient to establish public policy for purposes of a wrongful discharge claim. The court of appeals further held that Mariani presented sufficient evidence to establish that she was fired for refusing BCBS's requests to violate this rule. The court of appeals thus reversed the part of the trial court's ruling dismissing Mariani's wrongful discharge claim in violation of public policy and remanded the case for a new trial.

BCBS petitioned this court for certiorari review. We granted certiorari to determine the following:

1) Whether the second element of a public policy wrongful discharge claim can be satisfied based on an allegation that the employer required the employee to engage in conduct which allegedly violates the Colorado State Board of Accountancy Rules and Regulations.

2) Whether an employee must prove that she refused to perform an allegedly illegal directive from her employer in order to establish the third and fourth elements of a public policy wrongful discharge claim.

We hold that the Colorado State Board of Accountancy Rules and Regulations may constitute public policy for purposes of establishing a wrongful discharge claim in violation of public policy. We further hold that the plaintiff established a prima facie case of wrongful discharge under *Martin Marietta v. Lorenz*, 823 P.2d 100 (Colo.1992). We therefore affirm the court of appeals and remand with directions to order a new trial on Mariani's wrongful discharge claim.

II.

■ In general, employment contracts are at-will and either the employer or the employee may terminate the relationship at any time. *Continental Air Lines, Inc. v. Keenan*, 731 P.2d 708 (Colo.1987). In *Martin Marietta Corp. v. Lorenz*, 823 P.2d 100 (Colo. 1992), we recognized an exception to this general rule in situations where the employer terminated the employment contract in violation of public policy. The rational underlying this exception was the long-standing rule that a contract violative of public policy is unenforceable. *Lorenz*, 823 P.2d at 109. We concluded that it is the manifest public policy of this state that "an employee whether at will or otherwise, should not be put to the choice of either obeying an employer's order to violate the law or losing his or her job." *Id.*

■ "The essence of the public policy exception is that an employee will have a cognizable claim for wrongful discharge 'if the

discharge of the employee contravenes a clear mandate of public policy.'" *Id.*, 823 P.2d at 106 (quoting *Thompson v. St. Regis Paper Co.*, 102 Wash.2d 219, 685 P.2d 1081, 1089 (1984)). Mariani claims that BCBS terminated her for refusing to violate the Colorado State Board of Accountancy Rules of Professional Conduct. In particular, Mariani relies on Professional Rule 7.3 which prohibits a certificate holder from knowingly misrepresenting facts or subordinating their judgment to others.[6] At issue in this appeal is whether the Colorado State Board of Accountancy Rules of Professional Conduct and in particular Rule 7.3 may constitute a clear mandate of public policy for the purpose of a wrongful discharge cause of action.

### A.

■ BCBS argues that we should limit the sources of public policy for a wrongful discharge claim to constitutional or statutory provisions. BCBS claims that ethical codes, such as the one upon which Mariani relies, are too variable and ill-defined to provide employers and employees with fair notice as to what comprises public policy. We disagree.

We have never conclusively defined the sources of public policy for purposes of the public policy exception to employment at-will. In *Martin Marietta v. Lorenz*, 823 P.2d 100, 109 (Colo.1992), we stated that in order to establish a prima facie case for wrongful discharge in violation of public policy, the employee must prove that " ... the action directed by the employer would violate a *specific statute* relating to the public health, safety, or welfare, or would undermine a *clearly expressed public policy* relating to the employee's basic responsibility as a citizen or the employee's rights as a worker...." (Emphasis added.) Although we suggested that public policy would generally be limited to specific statutory mandates, we left open the question of whether clearly expressed public policy might be manifested elsewhere.

Jurisdictions are split as to whether to recognize non-legislative sources of public policy. Some jurisdictions limit the sources of public policy to statutory or constitutional sources.[7] This limitation stems from concerns that an expansive definition of public policy would be both unwieldy and unpredictable leaving employers and employees alike without direction as to the contours of the public policy exception. However, even courts that limit the public policy exception to statutory and constitutional sources cannot escape that concern. The identification of the statutory or constitutional provisions that qualify as clear expressions of public policy is a matter for judicial determination. *See Brockmeyer v. Dun & Bradstreet*, 113 Wis.2d 561, 335 N.W.2d 834, 841 (1983) (stating: "The determination of whether the public policy asserted is a well-defined and fundamental one is an issue of law and is to be made by the trial court.").

Other jurisdictions have recognized that non-legislative sources, including professional ethical codes, may provide the basis for a public policy claim.[8] Courts that have recog-

---

6. Rule 7.3 states:

 *Integrity and Objectivity.*
 A certificate holder shall not in the performance of professional services knowingly misrepresent facts, nor subordinate his judgment to others. In tax practice, however, a certificate holder may resolve doubt in favor of his client as long as there is reasonable support for his position.
 Rule 7.3, 3 C.C.R. 705–1 (1991).

7. *See, e.g., Gantt v. Sentry Ins.*, 1 Cal.4th 1083, 4 Cal.Rptr.2d 874, 881, 824 P.2d 680, 687 (1992) (holding that the courts may not declare public policy without a basis in either the constitution or statutory provisions); *Firestone Textile Co. Div. v. Meadows*, 666 S.W.2d 730, 733 (Ky.1983)(indicating that public policy must be

limited to a constitutionally protected right or statute); *Brockmeyer v. Dun & Bradstreet*, 113 Wis.2d 561, 335 N.W.2d 834, 840 (1983) (holding that public policy must be evidenced by constitutional or statutory provisions).

8. *See, e.g., Boyle v. Vista Eyewear, Inc.*, 700 S.W.2d 859, 871 (Mo.Ct.App.1985) (holding that public policy may be found in letter or purpose of constitutional, statutory, or regulatory provisions; in judicial decisions of state; and, in certain instances, in professional codes of ethics); *Cloutier v. Great Atlantic & Pacific Tea Co.*, 121 N.H. 915, 436 A.2d 1140, 1144 (1981) (holding that public policy exception is not limited to legislative directives); *Pierce v. Ortho Pharmaceutical Corp.*, 84 N.J. 58, 417 A.2d 505, 512 (1980) (holding that sources of public policy include

nized ethical codes as a potential source of public policy have noted that employees who are professionals have a duty to abide not only by federal and state law but also by the recognized codes of ethics of their professions. *Pierce v. Ortho Pharmaceutical Corp.*, 84 N.J. 58, 417 A.2d 505, 512 (1980); *see generally* Lawrence E. Blades, *Employment At Will vs. Individual Freedom: On Limiting the Abusive Exercise of Employer Power*, 67 Colum.L.Rev. 1404 (1967). As these ethical codes are central to a professional employee's activities, there may be a conflict at times between the demands of an employer and the employee's professional ethics.

A professional employee forced to choose between violating his or her ethical obligations or being terminated is placed in an intolerable position. *See General Dynamics v. Superior Ct.*, 7 Cal.4th 1164, 32 Cal. Rptr.2d 1, 15, 876 P.2d 487, 501 (1994). It is just such a situation that the public policy exception was meant to prevent. As we stated in *Lorenz*, "an employee should not be put to the choice of either obeying an employer's order to violate the law or losing his or her job." 823 P.2d at 109.

As is clear from the above discussion, the term public policy is not subject to precise definition. *Petermann v. International Bhd. of Teamsters*, 174 Cal.App.2d 184, 344 P.2d 25, 27 (1959). A common requirement in cases discussing the issue is that public policy must concern behavior that truly impacts the public in order to justify interference into an employer's business decisions. In addition, public policy must be clearly mandated such that the acceptable behavior is concrete and discernible as opposed to a broad hortatory statement of policy that gives little direction as to the bounds of proper behavior.[9]

Statutes by their nature are the most reasonable and common sources for defining public policy. In limited circumstances, however, we agree with the jurisdictions that hold there may be other sources of public policy such as administrative regulations and professional ethical codes. However, we quickly note that even those courts that have adopted ethical codes as a source of public policy have not done so without limitation. *See Pierce*, 417 A.2d at 512. In particular, in order to qualify as public policy, the ethical provision must be designed to serve the interests of the public rather than the interests of the profession. The provision may not concern merely technical matters or administrative regulations. In addition, the provision must provide a clear mandate to act or not to act in a particular way. Finally, the viability of ethical codes as a source of public policy must depend on a balancing between the public interest served by the professional code and the need of an employer to make legitimate business decisions. We also adopt these limitations as a prudent check on the public policy exception to employment at-will.

Thus, we hold that professional ethical codes may in certain circumstances be a source of public policy. However, we emphasize that any public policy must serve the public interest and be sufficiently concrete to notify employers and employees of the behavior it requires. We now turn to the issue of whether Rule 7.3 of the Colorado State Board of Accountancy Rules of Professional Conduct is of sufficient clarity and public value to qualify as an expression of public policy.

**B.**

BCBS argues that the Colorado State Board of Accountancy Rules of Professional Conduct are not clear mandates of public

9. *Compare Cronk v. Intermountain Rural Elec. Ass'n*, 765 P.2d 619 (Colo.App.1988) (statutes prohibiting employee from lying before Public Utility Commission and awarding preferences to developers constituted public policy) *with Lampe v. Presbyterian Medical Ctr.*, 41 Colo.App. 465, 590 P.2d 513 (1978) (statute allowing State Board of Nursing the power to revoke a nursing license if the nurse has negligently or willfully acted in a manner inconsistent with the health or safety of persons under his or her care did not constitute public policy).

legislation, administrative rules, regulations or decisions, and judicial decisions and in certain instances a professional code of ethics); *Payne v. Rozendaal*, 147 Vt. 488, 520 A.2d 586, 588 (1986) (holding that absence of statutory directive is not dispositive of whether there is a public policy against the directive).

policy but rather broad aspirational statements that cannot support a public policy claim. We disagree.

The Colorado State Board of Accountancy is established pursuant to section 12–2–103, 5A C.R.S. (1991). The Board has responsibility for making appropriate rules of professional conduct, in order to establish and maintain a high standard of integrity in the profession of public accounting. § 12–2–104, 5A C.R.S. (1991). These rules of professional conduct govern every person practicing as a certified public accountant. *Id.* Failure to abide by these rules may result in professional discipline. § 12–2–123, 5A C.R.S. (1991).

The rules of professional conduct for accountants have an important public purpose. They ensure the accurate reporting of financial information to the public. They allow the public and the business community to rely with confidence on financial reporting. Rule 7.1, 3 C.C.R. 705–1 (1991). In addition, they ensure that financial information will be reported consistently across many businesses. The legislature has endorsed these goals in section 12–2–101, 5A C.R.S. (1991), which includes the legislative declaration for establishing the Board of Accountancy. Section 12–2–101 states in pertinent part:

> It is declared to be in the interest of the citizens of the state of Colorado and a proper exercise of the police power of the state of Colorado to provide for the licensing and registration of certified public accountants, ... to provide for the maintenance of high standards of professional conduct by those so licensed and registered as certified public accountants.

Given this legislative declaration and the purposes of the rules of professional conduct for accountants, we hold that the rules have a sufficient public purpose to constitute public policy.

 Further, we conclude that Rule 7.3 [10] of the Colorado State Board of Accountancy Rules of Professional Conduct is a sufficiently clear mandate of public policy to sustain a wrongful discharge cause of action. Rule 7.3

is entitled "Integrity and Objectivity" and states:

> A certificate holder shall not in the performance of professional services knowingly misrepresent facts, nor subordinate his judgment to others. In tax practice, however, a certificate holder may resolve doubt in favor of his client as long as there is reasonable support for his position.

Rule 7.3, 3 C.C.R. 705–1 (1991). This rule mandates accuracy in financial reporting and furthers the laudable goal of establishing public confidence in financial reporting. The rule specifically directs an accountant to refrain from knowingly misrepresenting facts. The clear purpose of this rule is to prohibit accountants from falsifying information when completing tasks. The rule also directs accountants not to subordinate their judgment to others, such that an accountant may not succumb to pressure from his or her employer to misrepresent facts or deviate from generally accepted accounting principles. Both of these proscriptions provide clear direction to an accountant as to the scope of duty, and clear notice to an employer that accountants have a duty to report financial information fairly and accurately.

Thus, we hold that Rule 7.3 represents a clear mandate of public policy for purposes of establishing a claim for wrongful discharge in violation of public policy. Mariani was entitled to rely on this rule for purposes of her suit against BCBS. We affirm the court of appeals in its holding that the Colorado State Board of Accountancy Rules of Professional Conduct and Rule 7.3 in particular can be an adequate source of public policy for a wrongful discharge claim.

### III.

#### A.

 Having resolved the public policy question, we must now address the factual posture of Mariani's case before the trial court on motion for directed verdict. Preliminarily, we note that directed verdicts are not favored. "When a plaintiff makes out a pri-

---

10. Mariani also offered Rules 7.8 and 7.11 as sources of public policy; however, her principal argument before both the court of appeals and

this court focused on Rule 7.3 only and we confine ourselves to that Rule here.

ma facie case, even though the facts are in dispute, it is for the jury, and not the judge, to resolve the conflict." *Romero v. Denver & Rio Grande Western Railway,* 183 Colo. 32, 37–38, 514 P.2d 626, 629 (1973).

■ A reviewing court must consider all of the facts in the light most favorable to the nonmoving party, and determine whether a reasonable jury could have found in favor of the nonmoving party. This court described the second component of that analysis in *McGlasson v. Barger:*

> A motion for directed verdict can only be granted where the evidence, when so considered, compels the conclusion that the minds of reasonable men could not be in disagreement and that no evidence, or legitimate inference arising therefrom, has been presented upon which a jury's verdict against the moving party could be sustained.

163 Colo. 438, 442, 431 P.2d 778, 779 (1967); accord, e.g., *Smith v. City & County of Denver,* 726 P.2d 1125, 1128 (Colo.1986); *Nettrour v. J.C. Penney Co.,* 146 Colo. 150, 156, 360 P.2d 964, 967 (1961).[11]

### B.

■ The issue before the trial court on directed verdict was whether Mariani had presented a prima facie case for wrongful discharge under *Martin Marietta v. Lorenz,* 823 P.2d 100 (Colo.1992). The elements of a wrongful discharge claim under *Lorenz* can be summarized as follows: (1) the employer directed the employee to perform an illegal act as part of the employee's duties; (2) the action directed by the employer would violate a statute or clearly expressed public policy; (3) the employee was terminated as a result

of refusing to perform the illegal act; and (4) the employer was aware or should have been aware that the employee's refusal was based upon the employee's reasonable belief that the act was illegal. *Lorenz,* 823 P.2d at 109.

The trial court granted BCBS's motion for directed verdict solely on the grounds that Mariani failed to present evidence that the actions directed by her employer would violate a statute or clearly expressed public policy. The trial court made no factual findings regarding the remaining elements under *Lorenz.* We now conclude that Rule 7.3 is an expression of public policy, thereby overturning the trial court on that basis. We also briefly consider whether Mariani has presented sufficient evidence to establish a prima facie case of wrongful discharge in violation of public policy. BCBS argues that Mariani failed to show that her supervisors directed her to perform an illegal act and that she refused to do so. We disagree.

■ Mariani presented evidence from which a reasonable jury could have concluded that BCBS dismissed her for her refusal to falsify accounting information. For instance, while she was working on the proposed merger between BCBS, Nevada Blue Cross and Blue Shield and New Mexico Blue Cross and Blue Shield, Mariani's supervisor told her to identify benefits of the proposal. When she told her supervisor that she had tried to find benefits of the merger but was unable to do so, she testified that she was informed that she should not be working at BCBS. Taken in the light most favorable to Mariani, that evidence would indicate that she was directed to identify benefits of the merger plan or face job termination. She refused [12] to agree to what she perceived to

11. In a recent Supreme Court opinion, Justice Scalia indicated that in order to establish a prima facie case of age discrimination, the plaintiff need only present enough evidence to "create an inference" that the employment decision was based on discriminatory criteria. *O'Connor v. Consolidated Coin Caterers Corp.,* —— U.S. ——, ——, 116 S.Ct. 1307, 1310, 134 L.Ed.2d 433 (1996).

12. BCBS argues that Mariani objected to various accounting practices, but did not outright refuse to undertake them. First, we note that "refuse" is defined as: 1. to avoid or shun; 2. to decline

to accept; and 3. to show or express a positive unwillingness to do or comply with. Websters Third New International Dictionary 1910 (1961). Clearly, if Mariani objected to the accounting practices and did not participate in them or by inaction declined to undertake them, she satisfied the refusal component of *Lorenz.* Refusal is not limited to the verbal expression of refusal, but can consist of inaction as well. The objections Mariani voiced about the practices to her supervisors similarly satisfied the *Lorenz* requirement that the employer was aware or should have been aware of the reason for the refusal.

be false benefits that would contravene the rules of professional conduct for accountants; she was unable to identify any other benefits, and she was later terminated.[13] Such evidence satisfies the *Lorenz* standard for purposes of our limited consideration on appeal of a directed verdict.

### IV.

In conclusion, we hold that professional codes may be a source of public policy for purposes of a claim of wrongful discharge in violation of public policy. Mariani properly relied on Rule 7.3 of the Colorado State Board of Accountancy Rules of Professional Conduct as a source of public policy. She further presented evidence sufficient to satisfy the prima facie requirements of *Lorenz*. On the evidence Mariani adduced at trial, reasonable jurors could differ as to whether she was wrongfully discharged by BCBS. Therefore, jurors—not judges—must be allowed to make that ultimate determination. We affirm the court of appeals and remand with directions to order a new trial on Mariani's wrongful discharge claim.

---

**13.** Since Mariani presented sufficient evidence to establish that she actually refused her employer's directives to violate public policy, we decline to decide whether mere objection without other manifestation of refusal would alone satisfy the second and third elements under *Lorenz*.