**Donna JAYNES, Plaintiff–Appellant,**

v.

**CENTURA HEALTH CORPORATION, d/b/a St. Anthony Hospital Central, Defendant–Appellee.**

No. 04CA2084.

Colorado Court of Appeals, Div. V.

May 4, 2006.

As Modified on Denial of Rehearing June 29, 2006.

Certiorari Denied Dec. 4, 2006.*

* Chief Justice MULLARKEY would grant as to the following issues:

Whether a professional code of ethics must emanate from governmental action or must subject a member of that profession to the risk of adverse consequences in order for it to serve as a source of public policy for a wrongful discharge claim.

Whether the Colorado quality management function statute protects a health-care professional from retaliatory discharge because that professional submitted reports protected by the statute. whether the question of the specificity of promises made by an employer is an issue of fact to be resolved by the jury, or is an issue of law to be resolved by the court.

Roseman & Kazmierski, L.L.C., Barry D. Roseman, Denver, Colorado, for Plaintiff–Appellant.

Kutak Rock, LLP, Melvin B. Sabey, Mark L. Sabey, Denver, Colorado, for Defendant–Appellee.

WEBB, J.

In this wrongful discharge action, plaintiff, Donna Jaynes, appeals from the summary judgment entered in favor of defendant, Centura Health Corporation, doing business as St. Anthony Hospital Central, dismissing her public policy and breach of implied contract or promissory estoppel claims. We affirm.

Jaynes worked as a nurse at St. Anthony's. During her lengthy tenure, different entities, most recently Centura, owned and operated the hospital. She received various employee handbooks at different times, but she was never a party to an express employment contract.

Centura suspended Jaynes based on two specific incidents. In one, a disagreement arose involving Jaynes, a physician, and the patient's family concerning patient management. Jaynes alleged that she submitted an occurrence report to the hospital's Quality Assurance Committee concerning treatment of this patient. In the other, Jaynes delayed administering medication to a patient for eleven hours.

Jaynes responded to the suspension with lengthy, written denials of the allegations against her. Later she submitted an "action plan" in which she asserted that she had been acting as a "patient advocate" under her ethical obligations as a nurse. Centura then terminated her employment without going through a corrective action process. Following her termination, Jaynes did not request a review by the hospital's Problem Resolution Council.

## I. Summary Judgment Standard

We review a summary judgment de novo, *Vail/Arrowhead, Inc. v. Dist. Court,* 954 P.2d 608 (Colo.1998), and consider the facts in the light most favorable to the nonmovant. *Redmond v. Chains, Inc.,* 996 P.2d 759 (Colo. App.2000).

## II. Public Policy

■ Jaynes first contends the trial court erred in entering summary judgment for Centura on her public policy wrongful discharge claim. We disagree.

■ Absent an express contract providing otherwise, Colorado law presumes the employment relationship to be terminable at will by either party without liability. *Cont'l Air Lines, Inc. v. Keenan,* 731 P.2d 708 (Colo.1987). Common law exceptions to this presumption include the two issues in this case: public policy and implied contract or promissory estoppel. *Crawford Rehab. Servs., Inc. v. Weissman,* 938 P.2d 540 (Colo. 1997). An employee hired without an express contract has the burden of pleading and proving one of these exceptions. *Pickell v. Ariz. Components Co.,* 931 P.2d 1184 (Colo.1997).

In *Martin Marietta Corp. v. Lorenz,* 823 P.2d 100 (Colo.1992)(*Lorenz*), the supreme court held that an at-will employee has a claim for wrongful discharge "if the discharge of the employee contravenes a clear mandate of public policy." *Lorenz, supra,* 823 P.2d at 107 (quoting *Thompson v. St. Regis Paper Co.,* 102 Wash.2d 219, 685 P.2d 1081, 1089 (1984)). The *Lorenz* court set out four elements of a public policy wrongful discharge case:

- the employer directed the employee to perform an illegal act or prohibited the employee from performing a public duty or exercising an important job-related right or privilege;
- the action directed by the employer would violate a specific statute relating to the public health, safety, or welfare, or would undermine a clearly expressed public policy relating to the employee's basic responsibility as a citizen or the employee's rights or privileges as a worker;
- the employee was terminated as a result of refusing to perform the act directed by the employer; and
- the employer was aware, or reasonably should have been aware, that the employee's refusal to comply with the order was based on the employee's reasonable belief that the action ordered by the employer was illegal, contrary to clearly expressed statutory policy relating to the employee's duty as a citizen, or violative of the employee's legal rights or privileges as a worker.

The employee in *Lorenz* relied on 18 U.S.C. § 1001, a federal criminal statute proscribing fraud, as a source of public policy. But public policy may emanate from sources other than statutes.

In *Rocky Mountain Hospital & Medical Service v. Mariani,* 916 P.2d 519, 524 (Colo.1996)(*Mariani*), a certified public accountant brought a wrongful discharge action alleging that she had been terminated for refusing to act contrary to professional ethics. The supreme court held that public policy could be found in Rule 7.3, Rules of Professional Conduct, promulgated by the Colorado State Board of Accountancy, which provided in relevant part, "A certificate holder shall not in the performance of professional services knowingly misrepresent facts, nor subordinate his judgment to others."

According to the *Mariani* court, "[a] professional employee forced to choose between violating his or her ethical obligations or being terminated is placed in an intolerable position." *Mariani, supra,* 916 P.2d at 525. But the court also observed that "[t]hese rules of professional conduct govern every person practicing as a certified public accountant," and "[f]ailure to abide by these rules may result in professional discipline." *Mariani, supra,* 916 P.2d at 526.

In *Mariani,* the court went on to explain that "[t]he Board has responsibility for making appropriate rules of professional conduct." *Mariani, supra,* 916 P.2d at 526; *see* § 12–2–104(1)(b), C.R.S.2005. It quoted

from the legislative declaration establishing the Board, § 12–2–101, C.R.S.2005:

> It is declared to be in the interest of the citizens of the state of Colorado and a proper exercise of the police power of the state of Colorado to provide for the licensing and registration of certified public accountants ... to provide for ... the maintenance of high standards of professional conduct by those so licensed and registered as certified public accountants.

*Mariani, supra,* 916 P.2d at 526.

Since *Mariani,* neither the supreme court nor any division of this court has recognized a public policy wrongful discharge claim based solely on rules of professional conduct or ethics.

The identification of a statutory, constitutional, or other source as a sufficiently clear expression of public policy is an issue of law for the court. *Mariani, supra.* Appellate review of legal questions is de novo. *Awad v. Breeze,* 129 P.3d 1039 (Colo.App.2005).

### A. ANA Code and AACN Policy

Jaynes first argues that her termination violated public policy because it was, at least in part, in retaliation for conduct required by her ethical obligations as a nurse. We disagree.

On appeal, Jaynes cites to a publication of the American Nurses Association entitled "Code for Nurses with Interpretive Statements" (ANA Code) and a "public policy" entitled "Role of the Critical–Care Nurse" that appears on the American Association of Critical–Care Nurses website (AACN Policy) as sources of public policy.

Initially, we note Centura's assertion that Jaynes failed to establish a sufficient foundation under C.R.C.P. 56(e) for the ANA Code and the AACN Policy. We need not decide this issue, however, because we conclude, as a matter of law, that neither the ANA Code nor the AACN Policy supports a public policy wrongful discharge claim under *Mariani.*

Relevant facts concerning the ANA Code and the AACN Policy are not in dispute. Jaynes offered no evidence that she had ever been a member of the ANA or the AACN, and at her deposition she admitted that she was not currently an ANA member. She also acknowledged that the ANA is not a governmental entity and has no legal authority either to adopt rules or to impose sanctions for noncompliance with its Code. She presented no evidence that the AACN has any such legal authority.

Nor does the record contain any evidence that noncompliance with either the ANA Code or the AACN Policy would subject Jaynes to discipline by the State Board of Nursing. *See* § 12–38–117, C.R.S.2005 (listing "grounds for discipline" by the Board, which do not include violating the ANA Code, the AACN Policy, or any other rules of ethics or conduct).

These facts show that the ANA Code and the AACN Policy differ from State Board of Accountancy Rule 7.3 in several ways: (1) Rule 7.3 represents the exercise of expressly delegated legislative authority; (2) all certified public accountants are subject to Rule 7.3; and (3) violation of Rule 7.3 could subject a certified public accountant to discipline.

In *Mariani,* the supreme court relied primarily on *Pierce v. Ortho Pharmaceutical Corp.,* 84 N.J. 58, 417 A.2d 505 (1980), where a physician asserted that he had been terminated for refusing to engage in conduct that would have violated his Hippocratic oath, and cases citing *Pierce.* None of those cases upheld a public policy wrongful discharge claim based on a privately promulgated ethics code. The *Mariani* court also cited *General Dynamics Corp. v. Superior Court,* 7 Cal.4th 1164, 32 Cal.Rptr.2d 1, 876 P.2d 487 (1994), which involved mandatory professional conduct rules for licensed attorneys.

Thus, unlike the doctor in *Pierce,* the lawyer in *General Dynamics,* or the accountant in *Mariani,* on this record we cannot conclude that Centura placed Jaynes in the position of choosing between violating "her ethical *obligation* or being terminated." *Mariani, supra,* 916 P.2d at 525 (emphasis supplied).

Jaynes cites no case, and we have found none, recognizing the ANA Code or the AACN Policy as sufficient to sustain a public policy wrongful discharge action. To the

contrary, in *Warthen v. Toms River Community Memorial Hospital,* 199 N.J.Super. 18, 28, 488 A.2d 229, 234 (App.Div.1985), the court referred to "the dubious assumption that the [ANA's] *Code for Nurses* represents a clear expression of public policy." *See also Wright v. Shriners Hosp. for Crippled Children,* 412 Mass. 469, 473, 589 N.E.2d 1241, 1244 (1992)("We would hesitate to declare that the ethical code of a private professional organization [for nurses] can be a source of recognized public policy."). *But cf. Churchill v. Waters,* 977 F.2d 1114 (7th Cir.1992) (referring to ANA Code in reversing summary judgment against a nurse who asserted that she had been terminated for exercising her First Amendment rights), *vacated on other grounds,* 511 U.S. 661, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994).

A majority of jurisdictions have recognized that a professional code of ethics may constitute public policy sufficient to support a wrongful discharge claim. *See* Genna H. Rosten, Annotation, *Wrongful Discharge Based on Public Policy Derived from Professional Ethics Codes,* 52 A.L.R.5th 405 (1998). The codes in most of those cases, however, like those in *Mariani, Pierce,* and *General Dynamics,* but unlike the ANA Code and the AACN Policy, emanated from governmental action.

Jaynes correctly points out that the ANA Code and the AACN Policy meet two of the criteria announced in *Mariani, supra,* 916 P.2d at 525: both appear to be "designed to serve the interests of the public rather than the interests of the profession," and neither is limited to "merely technical matters or administrative regulations." Whether the ANA Code and the AACN Policy meet other *Mariani* criteria is disputed.

But we need not resolve that dispute because the ANA Code and the AACN Policy are purely private pronouncements, violation of which subjects a nurse to no adverse consequences. Recognizing such pronouncements as embodiments of public policy sufficient to sustain a wrongful discharge claim would extend *Mariani,* which we decline to do. *See Crawford Rehab. Servs., Inc. v. Weissman, supra,* 938 P.2d at 553 ("We must develop the common law in this area with care. The General Assembly is the branch of government charged with creating public policies, and the courts may only recognize and enforce such policies.").

Accordingly, we discern no error in entry of summary judgment on this aspect of Jaynes' public policy wrongful discharge claim.

## B. Quality Management Functions Statute

Jaynes next argues that her termination violated public policy arising from the Colorado quality management functions statute, § 25–3–109, C.R.S.2005 (QM statute), because it was partly in retaliation for her having filled an occurrence report with the hospital's Quality Assurance Committee. We disagree and conclude, as a matter of law, that the QM statute does not support a public policy wrongful discharge claim.

The QM statute recognizes that "implementation of quality management functions to evaluate and improve patient and resident care is essential to the operation of health care facilities." Section 25–3–109(1), C.R.S. 2005. Based on the need for "reasonably unfettered" collection of quality management information, the statute exempts quality management records and reports from subpoena, discovery, or admission in civil or administrative proceedings, and provides that, subject to exceptions not here relevant, these records "shall be confidential." Section 25–3–109(3), C.R.S.2005. Persons who "in good faith and within the scope of the functions of a quality management program" participate in reporting quality management information "shall be immune from suit in any civil action based on such functions." Section 25–3–109(6), C.R.S.2005.

But the QM statute does not require any health care facility to establish a quality management program. Nor does it command any employee of a facility that does establish such a program to report information "relating to the evaluation or improvement of the quality of health care services." Section 25–3–109(1).

Unlike the employee in *Lorenz,* who alleged that he had been terminated for refusing to perform a criminal act, here Jaynes

asserts that she was terminated for performing an act furthering the public policy created by a civil statute. Hence, Jaynes was not forced to choose between "obeying an employer's order to violate the law or losing [her] job." *Lorenz, supra,* 823 P.2d at 109.

However, the *Lorenz* court cited with approval cases recognizing a public policy wrongful discharge claim based on an employee's affirmative action in the context of a civil statute. *See, e.g., Lathrop v. Entenmann's, Inc.,* 770 P.2d 1367 (Colo.App.1989) (alleged retaliation for filing a workers' compensation claim); *Frampton v. Cent. Ind. Gas. Co.,* 260 Ind. 249, 297 N.E.2d 425 (1973) (same).

Thus, we apply the *Lorenz* criteria as relevant to the QM statute and conclude that Jaynes failed to establish a prima facie case of wrongful discharge. Because of this conclusion, we need not decide Centura's contention that summary judgment was proper because Jaynes failed to include the occurrence report on which she relies in the summary judgment record.

First, the QM statute does not clearly articulate a public policy by establishing "a public duty," disregard of which would undermine "the employee's basic responsibility as a citizen." *Lorenz, supra,* 823 P.2d at 109; *see, e.g., Nees v. Hocks,* 272 Or. 210, 536 P.2d 512 (1975) (recognizing a public policy claim where employee discharged for performing statutory duty to serve on a jury). To the contrary, the QM statute deals with events occurring at licensed health care facilities, not general duties of citizenship.

Second, the QM statute does not clearly articulate a public policy by creating "an important job-related right or privilege." *See, e.g., Lorenz, supra,* 823 P.2d at 109; *Hoyt v. Target Stores,* 981 P.2d 188, 191 (Colo.App.1998) ("job-related rights to be paid for travel time from store to store" protected by the Colorado Wage Claim Act); *Lathrop, supra* (right to file workers' compensation claim). The term "employee" does not appear in the QM statute, which instead refers to "persons" performing quality management functions.

Third, while the QM statute relates "to health, safety, or public welfare," *Lorenz, supra,* 823 P.2d at 109, it can only be violated, if at all, by disclosing confidential documents relating to quality management functions, which is not an issue in this case. Thus, even assuming that Centura retaliated against Jaynes for having submitted quality management information, and further assuming that such retaliation would chill other employees who might do so in the future, their silence, albeit coerced, would still not "violate a specific statute." *Lorenz, supra,* 823 P.2d at 109.

Jaynes' reliance on *Flores v. American Pharmaceutical Services, Inc.,* 994 P.2d 455 (Colo.App.1999), is unpersuasive. The statute at issue in *Flores,* § 10–1–128(2)(a), C.R.S.2005 (formerly codified at § 10–1–127(1.5)(a)), like the QM statute, established what the legislature considered good public policy: "the state of Colorado must aggressively confront the problem of insurance fraud." But the division did not expressly conclude that the statute, which is civil, not criminal, meets either part of the *Lorenz* test: creating "an important job-related right or privilege" or establishing a "basic responsibility as a citizen." *Lorenz, supra,* 823 P.2d at 109.

In contrast, in *Lampe v. Presbyterian Medical Center,* 41 Colo.App. 465, 590 P.2d 513 (1978), the division declined to recognize a sufficiently clear expression of public policy, although the statute at issue, § 12–38.1–101, C.R.S.2005 (formerly codified at § 12–38–201), stated that a regulatory authority governing nurse aides was necessary "in order to safeguard life, health, property, and the public welfare of the people of the state of Colorado." After discussing *Nees v. Hocks, supra,* and *Frampton v. Central Indiana Gas Co., supra,* the division concluded that the statute did not create a "specifically enacted" right (*Frampton*) or duty (*Nees*), but instead was only a "broad, general statement of policy." *Lampe, supra,* 41 Colo.App. at 468, 590 P.2d at 515.

In discussing the evolution of public policy wrongful discharge in Colorado, the *Lorenz* court cited but did not criticize *Lampe.* The supreme court repeatedly discussed *Framp-*

*ton* and *Nees* in formulating, as elements of a prima facie case for statutory policy wrongful discharge in the civil context, that the employer's action must compromise "a clearly expressed public policy relating to the employee's basic responsibility as a citizen or the employee's right or privilege as a worker." *Lorenz, supra*, 823 P.2d at 109. Thus, the supreme court drew the same conclusion as the division in *Lampe*, that *Frampton* and *Nees* "relied on a specifically enacted right and a duty, respectively." *Lampe, supra*, 41 Colo.App. at 468, 590 P.2d at 515. In our view, the *Lampe* division's unwillingness to rely on "general language" to impute to the General Assembly "an intent to modify the contractual relationships between hospitals and their employees," *Lampe, supra*, 41 Colo.App. at 468, 590 P.2d at 515–16, has, in cases based on civil statutes, evolved into the "clearly expressed" public duty or employee right formulation in *Lorenz* and its progeny.

Moreover, no Colorado Supreme Court opinion has upheld a public policy wrongful discharge claim absent a statutory crime, employee right, or public duty. Thus, to the extent that *Flores* and *Lampe* are in conflict, we consider *Lampe* to be more consistent with *Lorenz*. *See generally In re Estate of Becker*, 32 P.3d 557 (Colo.App.2000) (one division of the court of appeals is not bound by the decision of another division), *aff'd sub nom. In re Estate of DeWitt*, 54 P.3d 849 (Colo.2002).

Accordingly, we conclude the trial court did not err in granting Centura's motion for summary judgment on the public policy claim.

### III. Breach of Implied Contract or Promissory Estoppel

■ Jaynes finally contends the trial court erred in entering summary judgment on her breach of implied contract or promissory estoppel claim because Centura's personnel policies modified her at-will status. We disagree.

■ In *Continental Air Lines, Inc. v. Keenan, supra*, 731 P.2d at 711, the supreme court recognized that termination procedures in an employee manual may be enforceable under either implied contract or promissory estoppel theories where (1) a reasonable employee would construe the procedures as being binding on the employer; and (2) the procedures are sufficiently definite to allow a court to understand and enforce them. *See also Soderlun v. Pub. Serv. Co.*, 944 P.2d 616, 621 (Colo.App.1997).

■ However, if a statement by an employer is "merely a description of the employer's present policies or a forecast of the employee's likely career progression, it is neither a promise nor a statement that could reasonably be relied upon as a commitment." *Soderlun, supra*, 944 P.2d at 620; *see also Hoyt v. Target Stores, supra*.

■ The meaning of an employment policy, the wording of which is undisputed, is a question of law for the court. *George v. Ute Water Conservancy Dist.*, 950 P.2d 1195 (Colo.App.1997).

### A. Continuation of St. Anthony's Policies Under Centura

■ An employee cannot base a claim of wrongful discharge on an employment handbook that has been superseded, even where the prior handbook may have been promissory. *See Ferrera v. Nielsen*, 799 P.2d 458 (Colo.App.1990).

Jaynes does not dispute that she received three employee handbooks during her tenure at the hospital: (1) the St. Anthony Handbook adopted in 1988 and reprinted in 1990; (2) the Provenant Handbook adopted in the early 1990s; and (3) the Centura Employee Principles (Centura Principles) adopted on May 1, 1997. In addition, Provenant Health Partners adopted internal personnel policies and procedure guidelines in 1993 to 1994 (Provenant Guidelines), which were not distributed to employees but were instead used only by managers and supervisors.

Centura asserts that these guidelines, as well as the two prior employee handbooks, were superseded by the Centura Principles when Centura took over management of St. Anthony's. We agree in part.

The Centura Principles state: "[These principles] supersede and void previous Centura Health Affiliates' Human Resources Pol-

icies and Procedures, unless otherwise indicated." With regard to Problem Resolution Procedure, the Principles state: "This Principle is under construction and we anticipate its development in Fiscal Year 1998. Please refer to your facility Grievance Procedures or Problem Resolution Procedures for now."

Accordingly, we conclude that all previous handbooks and guidelines were superseded except for the Problem Resolution Procedures, discussed in section C.1. below.

### B. Effect of the Centura Disclaimer

Jaynes first argues that the disclaimer in the Centura Principles was neither clear nor conspicuous. We disagree.

■ A disclaimer to an employee handbook or personnel policy is effective "if the employer has clearly and conspicuously disclaimed intent to enter a contract limiting the right to discharge employees." *Ferrera v. Nielsen, supra,* 799 P.2d at 461. Termination procedures set forth in an employee manual or handbook do not create an implied contract where a clear disclaimer of any contractual rights appears. *Axtell v. Park Sch. Dist. R-3,* 962 P.2d 319, 322 (Colo.App.1998). *But see Evenson v. Colo. Farm Bureau Mut. Ins. Co.,* 879 P.2d 402, 409 (Colo.App.1993) (A clear and conspicuous disclaimer has no legal effect where the handbook "contains mandatory termination procedures or requires 'just cause' for termination.").

Whether a contract disclaimer is clear and conspicuous is a question of law for the court. *Durtsche v. Am. Colloid Co.,* 958 F.2d 1007 (10th Cir.1992).

Here, the disclaimer appears on the second page of the Centura Principles and is set off in a separate paragraph under the boldface title "Employment at Will." It states:

Because the principles and guidelines are intended to be flexible and provide general guidance, they should not be considered a contract either express or implied. Centura Health conducts its employment practices consistent with Colorado's "at will" law. Only the CEO, Executive Vice President and Senior Vice Presidents and Site Administrators have the authority to enter into an "Employment Agreement." Such

an agreement is valid only if reduced to writing and signed by one of the above officers and the employee. No other representative has the authority to make representations, promises or agreements regarding term or conditions of employment.

We consider this language clear and conspicuous, and conclude that the disclaimer was sufficient to apprise Jaynes that no principles or guidelines created an express or implied contract, especially in light of her admission to having read the Principles. *See, e.g., Silchia v. MCI Telecomms. Corp.,* 942 F.Supp. 1369 (D.Colo.1996) (disclaimer language is sufficiently conspicuous where it is set off in its own paragraph with the subject of the paragraph "Employment at Will" highlighted in bold and in upper case letters).

### C. Sufficiency of Policies VII–M and VII–K to Create an Implied Contract

■ Nevertheless, relying on *Evenson v. Colo. Farm Bureau Mut. Ins. Co., supra,* Jaynes argues that Policies VII–M and VII–K of the Provenant Guidelines created an implied contract or were binding on promissory estoppel principles because they establish mandatory termination procedures, require just cause for termination of employment, or both. We need not address the rule announced in *Evenson,* that a disclaimer may not defeat an implied contract or promissory estoppel claim, because we conclude that Jaynes did not invoke Policy VII–M and Policy VII–K is not mandatory.

As an initial matter, we recognize Centura's argument that Jaynes did not have access to these internal management policies before her termination. But to avoid a possible factual issue, we assume Jaynes may have had such access, even though they were internal management policies.

### 1. Policy VII–M

Policy VII–M is titled "Problem Resolution Procedure." Because the title matches the language in the Centura Principles expressly providing that such procedures should be followed until Centura develops its own problem resolution procedures, we conclude the

Centura Principles do not supersede this policy.

Policy VII–M sets forth procedures for a terminated employee to receive a hearing. The procedures state: "The employee, at all times, will have the burden of persuading the Problem Resolution Council that the employer's initial decision was in any way erroneous, and the Problem Resolution Council is not to set aside or modify the employer's decision unless the employee has sustained this burden." But if the Corrective Action Policies set forth in Policy VII–K were followed, then the only issue in the hearing is whether the employee engaged in conduct set forth in that policy.

Jaynes argues that an employee's right to obtain a hearing following termination under Policy VII–M would be meaningless if Centura could terminate the employment without following the Corrective Action Policies set forth in Policy VII–K. We reject this argument.

Under Policy VII–M, the terminated employee may proceed directly to Step C, entitled "Written Request to the Administrative Staff Member." At this step, the employee "must" submit a written request for resolution. Under Step D, entitled "Written Request for Review by Problem Resolution Council," the employee likewise must "submit a written request for hearing by the Problem Resolution Council."

Here, Jaynes does not identify in the summary judgment record a written request from her to invoke either Step C or Step D. Thus, she cannot assert any rights under this policy because she did not follow the policy by asking Centura for such procedures.

Accordingly, we conclude that Policy VII–M did not alone modify Jaynes' at-will status on the basis of implied contract or promissory estoppel.

### 2. Policy VII–K

Jaynes also argues that Policy VII–K is preserved through Policy VII–M, which refers to Policy VII–K. Regardless, we conclude that Policy VII–K provides no rights enforceable under an implied contract or promissory estoppel theory.

Policy VII–K, entitled "Corrective Action for Unacceptable Performance/Conduct," sets forth "guidelines" for managers to deal with employee conduct. It explains that "[n]ormally, corrective action will be taken in a progressive manner (verbal counseling, first written warning, final written warning . . . release from employment)." The guidelines give management discretion in dealing with unacceptable employee conduct: "However, dependent upon the nature of the violation or performance deficiency, an employee may be subject to any step of corrective action including immediate written warning, suspension, and/or release from employment." The terms "guidelines" and "normally" are consistent with discretionary rather than mandatory termination procedures.

Hence, we conclude Centura made no promise of specific treatment, and thus, the policy did not create an implied contract or give rise to estoppel. *See, e.g., Horton v. Darby Elec. Co.,* 360 S.C. 58, 599 S.E.2d 456 (2004) (progressive discipline policy did not constitute a contract where there were conspicuous disclaimers and policy language was discretionary rather than mandatory); *Drobny v. Boeing Co.,* 80 Wash.App. 97, 907 P.2d 299, 303 (1995) (no implied contract requiring progressive discipline existed where employer retained discretion on a case-by-case basis to determine whether conduct was serious enough to merit dismissal without recourse to progressive discipline).

Therefore, the trial court did not err in granting summary judgment for Centura on Jaynes' breach of contract and promissory estoppel claims.

The judgment is affirmed.

RUSSEL and HAWTHORNE, JJ., concur.