CHIEF JUSTICE COATS, dissenting.
¶51 I do not agree with the majority that the ethical rules promulgated by this court for the supervision of the practice of law are in any way capable of expressing the public policy of the jurisdiction. Nor do I agree that a violation of those rules, even if they could be a source of public policy, could have the effect on contract formation envisioned by the majority. And finally, although I applaud its decision to vacate the intermediate appellate court's extension of the doctrine of collateral estoppel, or issue preclusion, to bar the litigation of facts previously determined by a lawyer disciplinary panel, I am not as sanguine as the majority about its own ability to dodge the question and still reach the conclusion it does in this case. Because I not only disagree with the majority's reasoning and understanding of our prior decisions, but also fear we will come to regret injecting our own rules governing the practice of law into questions of civil liability, I respectfully dissent and outline my concerns.
¶52 To begin, I do not agree that our Rules of Professional Conduct can be viewed as a source of public policy for purposes of contract liability, nor do I believe we have ever suggested anything of the kind. In Rocky Mountain Hospital & Medical Service v. Mariani , heavily relied on by the majority, we narrowly held that under limited circumstances, professional ethical codes, just as constitutional or statutory provisions themselves, may be looked upon as a source of public policy for purposes of the public policy exception to what would otherwise be an employment at-will. 916 P.2d 519, 525-26 (Colo. 1996). In that case, we specifically found that "[t]he essence of the public policy exception is that an employee will have a cognizable claim for wrongful discharge 'if the discharge of the employee contravenes a clear mandate of public policy,' " id. at 523-24 (quoting Martin Marietta Corp. v. Lorenz , 823 P.2d 100, 107 (Colo. 1992), and that Rule 7.3 of the Colorado State Board of Accountancy Rules of Professional Conduct, entitled "Integrity and Objectivity,"
*436 3 Colo. Code Regs. 705-1 (1991) ), "represents a clear mandate of public policy for purposes of establishing a claim for wrongful discharge in violation of public policy ," Mariani , 916 P.2d at 526 (emphasis added). In that case, we therefore held, at most, that proof of an employee's discharge for complying with professional ethical rules may sometimes be sufficient to make out a claim for wrongful discharge-not that failing to comply with professional ethical obligations constitutes a violation of public policy capable of invalidating an otherwise valid contract.
¶53 Furthermore, to the extent considerations of public policy have been recognized to render a contractual agreement unenforceable, their effect has been limited to nullifying particular terms that are offensive to public policy. See Restatement (Second) of Contracts § 178 (Am. Law Inst. 1981) ("A promise or other term of an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable or the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms ."(emphasis added)); see also, e.g. , Boles v. Sun Ergoline, Inc. , 223 P.3d 724, 727-28 (Colo. 2010) (exculpatory agreement releasing manufacturer from strict products liability held to violate public policy); Peterman v. State Farm Mut. Auto. Ins. Co. , 961 P.2d 487, 493 (Colo. 1998) (consent to sue clause in auto insurance policy violated public policy); Martinez v. Cont'l Enters. , 730 P.2d 308, 316 (Colo. 1986) (public policy favoring possession by mortgagor prior to foreclosure prevailed over contrary contractual provision in deed of trust). I am unaware (and the majority does not suggest) that either this court or the court of appeals has ever approved a public policy defense to contract formation until now, perhaps because traditionally accepted defenses to contract formation already incorporate such policy-related concerns as incapacity, duress, and undue influence, as well as mistake, misrepresentation, and fraud. It is far from clear to me why the majority considers these long-established defenses inadequate to protect law clients, regardless of their sophistication and capability, from forging agreements with their attorneys, and instead feels it necessary to effectively extend a presumption of undue influence whenever the attorney fails to fully comply with the Rules of Professional Conduct, notwithstanding the Rules' own express admonition that a violation shall not create any presumption that a legal duty has been breached. See Colo. RPC, Preamble & Scope, [20].
¶54 Although I therefore find problematic enough the creation of a new defense to contract formation based on the failure of a contracting party to comply with professional ethical codes, I am particularly concerned about creating a new contract defense based on rules promulgated by this court in the exercise of its constitutional authority to supervise the practice of law in the jurisdiction. This court has jealously guarded its authority over the practice of law, not only promulgating the rules that govern the ethical practice of the law but also designing the machinery, including specific requirements and procedures, for being admitted, remaining in good standing, and being disqualified from the practice of law. See People v. Kanwal , 2014 CO 20, ¶ 6, 321 P.3d 494, 495-96. Unlike professional ethical codes promulgated according to the State Administrative Procedure Act, on the basis of authority expressly delegated by the General Assembly, like the Colorado State Board of Accountancy Rules of Professional Conduct, see §§ 12-2-101 to - 104, C.R.S. (2018), which in Mariani we compared to sources of public policy like statutory and constitutional provisions, 916 P.2d at 525-26, the Colorado Rules of Professional Conduct are promulgated by this court, pursuant to its exclusive constitutional authority to supervise the practice of law, rather than according to any statutorily approved administrative procedures.
¶55 While the court of appeals has at times relied on the Rules of Professional Conduct as a source of public policy strictly for the purpose of interpreting engagement contracts relative to attorney fee provisions and exclusion from malpractice claims, see, e.g. , S. Colo. Orthopaedic Clinic Sports Med. & Arthritis Surgeons, P.C. v. Weinstein , 2014 COA 171, ¶¶ 1, 14-15, 343 P.3d 1044, 1045, 1047-48 (public policy codified in Colo. RPC 1.5(a) requires courts to impose a reasonableness requirement on attorney fee-shifting *437 provision in employment contract); Norton Frickey, P.C. v. James B. Turner, P.C. , 94 P.3d 1266, 1266-67 (Colo. App. 2004) (contract to apportion attorney fees upon an attorney's departure from a law firm was not contrary to this policy embodied in Colo. RPC 1.5(a) ); Roberts v. Holland & Hart , 857 P.2d 492, 495-96 (Colo. App. 1993) (contractual assignment of legal malpractice claims contravenes public policy embodied in the Colorado Rules of Professional Conduct that attorneys owe clients duties of loyalty and confidentiality), this court has not even gone that far. Unlike the majority, I see no merit in implicating delicate separation of powers questions by interpreting our Rules of Professional Conduct to affect matters of substantive law, rather than merely the practice of law.
¶56 Finally, because of the unique purposes and procedures of attorney discipline, I would make clear that apart from the fact of their occurrence and their impact on an attorney's status with regard to the practice of law, those procedures cannot affect his rights or liabilities in civil or criminal proceedings. If for no other reason, I believe the unique procedures provided for alleging and proving disciplinary violations, before a panel the majority of whom are lay members of the bar, preclude application of the doctrine of collateral estoppel, or issue preclusion, to subsequent civil or criminal proceedings. While I appreciate the majority's attempt to avoid this question by finding that it was unnecessarily decided by the intermediate appellate court, I fail to see how any admission before us or allegation of the complaint below resolves the question, in light of the majority's newly created voidability standard, whether or not the contract in this case is actually void. Without (at least implicitly) relying on the evidence and findings of the Hearing Board, and without remanding for factual determinations concerning the communications and understanding of the parties, I fail to see how, despite its protestations to the contrary, the majority does not simply hold that in the absence of compliance with Rule 1.8's requirement for a writing, any contract between an attorney and client is simply void.
¶57 I find the majority's creation of a new public policy defense to contract formation, based on professional ethical codes in general, and the Colorado Rules of Professional Conduct in particular, to be especially unfortunate where it seems so unnecessary. If the facts upon which the majority relies to find it impossible for Calvert to overcome the presumption are indeed conceded, it is difficult to understand why Mayberry would not be equally entitled to summary judgment on the basis of some of the aforementioned well-accepted defenses to contract formation, without reference to public policy at all; and even if not undisputed for purposes of summary judgment, proof of these defenses at trial would appear to be easily accomplished. Even if I did not so strongly reject the majority's reasoning, I would be disinclined to make new law with the potential for such broad and unpredictable impact, without considerably greater cause.
¶58 I therefore respectfully dissent.
I am authorized to state that JUSTICE SAMOUR joins in this dissent.